In the Interest of G. H., a child.

SPECIAL EDUCATION DIVISION OF the DEPARTMENT OF PUBLIC INSTRUCTION of the State of North Dakota, Petitioner and Appellee,

v.

G. H. et al., Respondents,

and

Williams County Welfare Board and Public Welfare (Social Service) Board of the State of North Dakota, Respondents and Appellants.

Civ. No. 8930.

Supreme Court of North Dakota.

April 30, 1974.

Rehearing Denied June 4, 1974.

Gerald W. VandeWalle, Asst. Atty. Gen., Bismarck, for Sp. Ed. Div. of the Dept. of Public Instruction, petitioner and appellee.

Rolfstad, Winkjer, Suess, McKennett & Kaiser, Williston, for Williston School District No. 1.

Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for Crippled Children's School.

Anseth & Rustad, Williston, for Williams County Welfare Board, respondent and appellant.

Milton E. Moskau, Sp. Asst. Atty. Gen., Bismarck, for Public Welfare (Social Service) Board, respondent and appellant.

Lundberg & Nodland, Bismarck, for North Dakota Association for Retarded Children, Inc., and Robert L. Burgdorf, Jr., South Bend, Ind., for National Center for Law and the Handicapped, Inc., amici curiae.

VOGEL, Judge.

G. H., in whose interest this action was brought, was born on July 27, 1957, with severe physical handicaps which need not be detailed. She is educable, and is expected to finish her grade school education soon. At the time of her birth her family lived at Williston, Williams County, North Dakota, in Williston School District No. 1.

She spent some time at the Grafton State School (for retarded children), but did not really belong there, so she was sent to the Crippled Children's School at Jamestown, North Dakota, at the request of the superintendent of the Grafton State School. The Crippled Children's School is a private, nonsectarian, nonprofit institution. G. H. has now spent most of her 17 years of life there.

Her parents were unable to pay the charges at that school, even though approximately half of the expenses of the school are paid by charitable contributions. So the Williams County Welfare Board began paying the cost of keeping her in a foster home in Jamestown, while Williston School District No. 1 contracted with the Crippled Children's School to pay her tuition. Such contracts are authorized by Chapter 15-59, North Dakota Century Code, which provides, in substance, that a school district may contract with a private, nonsectarian, nonprofit corporation for the cost of educating handicapped children and agree to pay three times the State average

per-pupil elementary or high school cost. Sixty per cent of such cost is reimbursed by the Special Education Division of the Department of Public Instruction of the State of North Dakota.

All went well until the parents of G. H. moved to Minneapolis, Minnesota, in 1969, leaving her at the Crippled Children's School in Jamestown. Williston School District No. 1 stopped paying the tuition at the school as of September 1, 1969, while the County Welfare Board continued to pay for the foster home care. The Crippled Children's School continued to provide her with educational services, without reimbursement by anyone.

On March 20, 1970, Reuben E. Carlson, an officer of the State Public Welfare Board, petitioned the district court of Stutsman County (where the Crippled Children's School is located) to make a determination concerning the care, custody, and control of G. H., and asserted that she was a deprived child without proper parental care or control; that her parents were not living together and were unable to provide a suitable home for her; that she had physical disabilities which make it necessary for her to attend the Crippled Children's School; and that her parents were unable to cope with her many needs because of her physical condition. The action was brought by Reuben E. Carlson, and the respondents were G. H. and her parents. After a hearing, the district court made findings on May 14, 1970, that G. H. is a deprived child, that her parents were unable to provide for her, that the causes of her deprivation were not likely to be remedied, that her mother was confined to a hospital for psychiatric treatment, that it was impossible for her parents to care for her, that the most suitable place for her was the Crippled Children's School, and that the parents had not established permanent residence outside the Williston area. The court further found that the Crippled Children's School had proper facilities for her education and that there were no public schools in the State of North Dakota with the necessary facilities

which would accept her. The court further found that the Williams County Welfare Board was providing for her care and that up to September 1, 1969, when the parents left Williston, the Williston School District paid the tuition at the Crippled Children's School.

The court thereupon ordered that G. H. be taken under the juvenile jurisdiction of the court, that her care, custody, and control be transferred to the director of the Williams County Welfare Board, and that her father pay $55 per month to the Williams County Welfare Board if his income warranted. Williston School District No. 1 was ordered to pay the educational costs at the Crippled Children's School retroactively to September 1, 1969, and continuously thereafter so long as she remains a student at the School.

Copies of the order were served upon the administrator of the Williston school district, the area social service center at Williston, and the Crippled Children's School, as well as upon G. H.'s father.

The school district, on May 13, 1971, moved the court to vacate that portion of the order requiring it to pay for the tuition, upon grounds of (1) mistake, inadvertence, surprise or excusable neglect, and (2) fraud, misrepresentation or other misconduct of an adverse party. The motion was supported by affidavits of the register of deeds of Williams County to the effect that no real property was owned by G. H.'s father in Williams County, and of Leon Olson, the superintendent of schools of Williston, to the effect that G. H.'s father had sold his house at Williston on September 4, 1969, and her parents had moved to Minneapolis, where they had resided for 21 months. Upon a hearing on this motion, the court made certain findings as to the parents' moving to Minneapolis, but reiterated its previous findings that G. H. was a deprived child, that her parents were unable to care for her, that she was attending a crippled children's school which was a fit and proper place for her and in her best interests to attend. The court further

found that her parents were then residents of Minneapolis and that her father was capable of contributing $40 per month toward her support, that G. H. was not a student of Williston School District No. 1, as that term is defined in Section 15–59–07, N.D.C.C., and that her tuition was an obligation of the Special Education Division of the State Department of Public Instruction for the year 1970–1971 and thereafter until assumed by the State of Minnesota or until further order of the court. The court vacated its prior order requiring the school district to pay the tuition and ordered the Special Education Division to do so. The responsibility of the Williams County Welfare Board for general subsistence and foster-home care was continued. Notice of the latter hearing was served upon the parents of G. H., Mr. Carlson of the Public Welfare Board, and the attorney for the Crippled Children's School; and attorneys for the school district, the Public Welfare Board, and the Crippled Children's School participated in the hearing, as did the director of the Williams County Welfare Board and others.

Thereupon the Special Education Division petitioned for the vacation of portions of the order of July 27, 1971, asserting that it was unauthorized to pay tuition except as reimbursement to school districts under Chapter 15–59, referred to above. A summons and notice to appear was served upon attorneys for the Crippled Children's School, the County Welfare Board, the Public Welfare Board for the State, the Williston school district, the Department of Public Instruction, and the parents of G. H. After a hearing, the court further amended its order to provide that the Public Welfare Board and the Williams County Welfare Board be required to pay the tuition. The specific language of the court's order is as follows:

"ORDERED

"I.

"That the above named minor child, G. H., is continued under the juvenile jurisdiction of this Court and is hereby declared to be a ward of the State; that the care, control, custody of said child be and the same is hereby continued with the Director of the Williams County Welfare Board, Williams County, North Dakota, and that all major medical determinations be made with the consent of the parents.

"II.

"It is further Ordered that . . . father of said child, G. H., is to furnish to the Williams County Welfare Board copies of his income tax returns and that he is to report his income to said agency each month and that if his income warrants he is to pay not less than Forty Dollars ($40.00) per month to the Williams County Welfare Board.

"III.

"It is further Ordered that the Williams County Welfare Board continue to be responsible for general subsistence and foster care of said minor child, subject to reimbursement as heretofore Ordered.

"IV.

"It is further Ordered that the Public Welfare Board of North Dakota and the Williams County Welfare Board be and is required to pay the educational care costs of said minor child, G. H., at the Crippled Children's School at Jamestown, North Dakota, retroactively to the first of September, 1970, and continuously thereafter while she is a student and inmate of said school and until the further order of this Court; and it is further specifically ordered and determined that the additional cost of such retroactive educational care through the year 1972 is the sum of $3908.00."

Service of the order was made upon all the parties to the present appeal, as well as other persons.

The Williams County Welfare Board attempted to file a "Special Appearance and Petition for Leave to be Heard and to Vacate Amended Order, dated June 5, 1973," but the trial court refused to consider it.

From the amended order the Public Welfare Board of the State of North Dakota (now designated by statute as Social Service Board of North Dakota) appealed only from paragraph IV of the order, and the Williams County Welfare Board appealed from all four paragraphs of the order.

When the appeal was perfected, all parties named in the title were represented by attorneys, except G. H. herself. On our own initiative, we requested the North Dakota Association for Retarded Children to file a brief amicus curiae. We are grateful to the Association for having done so and for enlisting the support of the National Center for Law and the Handicapped, which joined in the brief and participated in the oral argument.

## CONSTITUTIONAL RIGHT TO EDUCATION

Two kinds of expenditures are involved in this appeal. The first is, perhaps inadequately, described as *subsistence*. This description includes the foster home care, including board and room of G. H., as well as payments for physical therapy and some incidental expenses for her. These sums have been paid for years by the Williams County Welfare Board. Although that board appealed from the order of the district court, it continued to make payments for subsistence, and concedes that it will continue to make the payments if no one else makes them.

The greatest disagreement arises over the second category of expenses, also described inadequately, the so-called *tuition* at the Crippled Children's School. This designation necessarily covers more than the ordinary kind of education, since education of handicapped children requires a different kind of physical plant to accommodate their physical handicaps, a differ-ent kind of teaching adapted to the mental handicaps which so often accompany the physical ones, and special kinds of teachers to assist in surmounting the problems arising from all the varieties of handicaps encountered.

The first question to arise, incredibly enough, is whether G. H. is entitled to have her tuition paid by anyone. A great many handicapped children in this State have had no education at all, which might indicate that they are entitled to none. A further shadow on their claim to an education has been cast, according to some of the briefs before us, by the decision of the United States Supreme Court in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), which held that education is not a right mandated by the United States Constitution. We will return to the *Rodriguez* case later, but at this point we will consider whether the right to an education is a constitutional right under the Constitution of this State. We held long ago that it is, and we now reiterate that holding.

"The historic policy of this state, in common with the general policy of every other state in the Union, is to maintain a free public school system for the benefit of all children within specified age limits.

"This policy existed prior to statehood and is crystallized in sections 147 and 148 of the State Constitution, which read as follows:

'A high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people being necessary in order to insure the continuance of that government and the prosperity and happiness of the people, the legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control. This legislative requirement

shall be irrevocable without consent of the United States and the people of North Dakota.' [Sec. 147, Constitution of N.D.]

'The legislative assembly shall provide, at its first session after the adoption of this constitution, for a uniform system for free public schools throughout the state, beginning with the primary and extending through all grades up to and including the normal and collegiate course.' " [Sec. 148, Constitution of N.D.] Anderson v. Breithbarth, 62 N.D. 709, 245 N.W. 483, 484 (1932).

■ We are satisfied that all children in North Dakota have the right, under the State Constitution, to a public school education. Nothing in *Rodriguez, supra,* holds to the contrary. The State of New Jersey has held, since *Rodriguez,* that education is a right under the Constitution of that State. Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273 (1973).

■ Handicapped children are certainly entitled to no less than unhandicapped children under the explicit provisions of the Constitution. Whether those who have been unconstitutionally deprived of education in the past have a constitutionally based claim for compensatory educational effort, we leave for future determination. See In re H., 72 Misc.2d 59, 337 N.Y.S.2d 969 (Family Court, Queens County, 1972).

■ For the present, we say only that failure to provide educational opportunity for handicapped children (except those, if any there are, who cannot benefit at all from it) is an unconstitutional violation of the foregoing constitutional provisions, as well as Section 11 of the North Dakota Constitution and Section 20 of the North Dakota Constitution, which provide that all laws of a general nature shall have a uniform operation and that no class of citizens shall be granted privileges or immunities which upon the same terms shall not be granted to all citizens.

We find nothing in *Rodriguez, supra,* to persuade us to a different view. On the contrary, education has long been the primary responsibility of the States, and it is only natural that their constitutions should provide for a right to an education; while the Federal Constitution, as *Rodriguez* points out, is silent on the subject of education.

And even the *Rodriguez* opinion indicates that Federal constitutional questions would arise if there were a total deprivation of educational opportunities, as there would be here if none of the parties before us was paying for the education of G. H. As the Court said in *Rodriguez*:

"The argument here is not that the children in districts having relatively low assessable property values are receiving no public education; rather, it is that they are receiving a poorer quality education than that available to children in districts having more assessable wealth." 411 U.S., at p. 23, 93 S.Ct., at 1291.

"Texas asserts that the Minimum Foundation Program provides an 'adequate' education for all children in the State. By providing 12 years of free public school education, and by assuring teachers, books, transportation and operating funds, the Texas Legislature has endeavored to 'guarantee, for the welfare of the state as a whole, that all people shall have at least an adequate program of education. This is what is meant by "A Minimum Foundation Program of Education." ' The State repeatedly asserted in its briefs in this Court that it has fulfilled this desire and that it now assures 'every child in every school district an adequate education.' No proof was offered at trial persuasively discrediting or refuting the State's assertion." 411 U.S., at p. 24, 93 S.Ct., at 1291.

While the Supreme Court of the United States, using the "traditional" equal-protection analysis, held that the Texas system of educational financing, which relied largely upon property taxes, was constitu-

tional, we are confident that the same Court would have held that G. H.'s terrible handicaps were just the sort of "immutable characteristic determined solely by the accident of birth" to which the "inherently suspect" classification would be applied, and that depriving her of a meaningful educational opportunity would be just the sort of denial of equal protection which has been held unconstitutional in cases involving discrimination based on race and illegitimacy and sex. See Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); New Jersey Welfare Rights Organization v. Cahill, 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973).

■ In Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court said, "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." When North Dakota undertakes to supply an education to all, and to require all to attend school, that right must be made available to all, including the handicapped, on equal terms.

The plain language of our constitutional provisions requires this conclusion. Even if it did not, the Federal Constitution would. The leading case as to the rights of the handicapped is Pennsylvania Association for Retarded Children v. Commonwealth of Pennsylvania, 334 F.Supp. 1257 (E.D.Pa.1971), affirmed and settlement approved by a three-judge court at 343 F. Supp. 279 (1972). It is cited approvingly in Harrison v. State of Michigan, 350 F. Supp. 846 (E.D.Mich.1972). Another similar case is Mills v. Board of Education of District of Columbia, 348 F.Supp. 866 (D. C.D.C.1972).

Even if we were disposed to avoid or evade our duty to construe the State Constitution to require educational opportunity for the handicapped (and we are not so

disposed), the Federal courts would surely construe the Federal Constitution to require the same result, and properly so. See Reid v. Board of Education of City of New York, 453 F.2d 238 (2d Cir. 1971), and Federal cases *supra*.

■ We hold that G. H. is entitled to an equal educational opportunity under the Constitution of North Dakota, and that depriving her of that opportunity would be an unconstitutional denial of equal protection under the Federal and State Constitutions and of the Due Process and Privileges and Immunities Clauses of the North Dakota Constitution.

In fairness to the parties here, we must add that there is little disagreement among them as to the right of G. H. to an education (although one of them appears to claim that the State's duty to provide aid to welfare clients means only the duty to provide subsistence, defined as "shelter, food, clothing and medical attention and nothing else" —a view we do not share). What the parties argue about most is the identity of the agency which is to pay for the education of G. H.

## WHO SHALL PAY?

Resolution of this question depends upon a decision as to the residence of G. H. for school purposes. That problem was exhaustively discussed in Anderson v. Breithbarth, *supra*. Although the statutes have been amended in many respects since then, the amendments would not change the result.

Section 15–59–07, relating to education of students with physical handicaps and learning disabilities, says nothing about residence. It tells only what is to be done if any school district "has" such a handicapped child.

■ The facts here are very similar to *Anderson*. In *Anderson*, a child had been more or less abandoned by her parents and left with relatives, who enrolled her in a local school. The school district chal-

lenged her right to attend the school without the payment of tuition by the district of her former residence or the district of her parents' then residence. We held that it was the residence of the child which was controlling, and that she was entitled to attend the school where she resided with relatives.

■ In the present case, if the Williston School District had facilities within its district to educate handicapped children such as G. H., she would no doubt still be living there, and *Anderson* would be exactly in point and controlling.

Does the fact that Williston has no such facilities, and therefore contracted with the Crippled Children's School to provide them, change the situation in any material way? We think not. A contract between a school district and the Crippled Children's School does not change the residence of the child, which remains within the contracting district.

We therefore hold that the trial court was correct in its order of May 14, 1970, in holding that Williston School District No. 1 was liable for the tuition of G. H. at the Crippled Children's School and that it erred in later modifying that order to provide that the Special Education Division of the State Department of Public Instruction be required to make such payments. [The Special Education Division will reimburse the School District for a portion of the costs, pursuant to Chapter 15–59, as it has consistently offered to do.]

We so hold, even though the child's parents have moved from the State of North Dakota and established residence elsewhere. G. H. has been determined to be a ward of the State. Her residence is separate from that of her parents. Anderson v. Breithbarth, *supra*. If Williston were not her residence, we would have to decide whether the responsibility for her care lay with the Social Service Board of the State.

By holding that the Public Welfare Board (now Social Service Board) is not liable for the tuition of G. H., we do not mean to agree in any sense with its position that it cannot be held liable because it has no appropriation specifically designated for that purpose or that it must first obtain approval from the Department of Health, Education, and Welfare of a "plan" to make any such provisions. We are not so federalized that a State department is not subject to the courts of the State. See Collins v. State Board of Welfare, 248 Iowa 369, 81 N.W.2d 4 (1947).

Affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.

ERICKSTAD, C. J., and TEIGEN, KNUDSON and PAULSON, JJ., concur.