**BISMARCK PUBLIC SCHOOL DISTRICT # 1 and the following taxpayers and parents residing in and their children enrolled in Bismarck Public School District # 1: Jeff Geiger, individually and as parent of Matthew Geiger; Sandy Horst, individually and as parent of Jacki Horst and Jessica Horst; George Keiser, individually and as parent of Sarah Keiser; Quentin Wangler, individually and as parent of Nicholas Wangler; Robert Penne, individually and as parent of Jonathan Penne; Gary**

Christenson, individually and as parent of Brandon Christenson; Karen Hoovestal, individually and as parent of Mark Hoovestal and Keith Hoovestal; Devils Lake Public School District # 1 and the following taxpayers and parents residing in and their children enrolled in Devils Lake Public School District # 1: Jay Klemetsrud, individually and as parent of Eric Klemetsrud; Paul Goulding, individually and as parent of Thomas Goulding; Dickinson Public School District # 1 and the following taxpayers and parents residing in and their children enrolled in Dickinson Public School District # 1: Dennis W. Johnson and Nancy Jo Johnson, individually and as parents of Timothy Johnson, Amie Johnson and Christopher Johnson; Phyllis Dvorak and Alvin L. Dvorak, individually and as parents of Eric Dvorak, Jason Dvorak and Deidra Dvorak; LeRoy Fettig, individually and as parent of Alicia Fettig; Lawrence A. Gardner and Marty Odermann, individually and as parents of Megan Gardner; Grafton Public School District # 3 and the following taxpayers and parents residing in and their children enrolled in Grafton Public School District # 3: Roger Moe, individually and as parent of James Moe and Susan Moe; Mandan Public School District # 1 and the following taxpayers and parents residing in and their children enrolled in Mandan Public School District # 1: Pamela Engelhardt, individually and as parent of Levi Engelhardt; Herman A. Schafer, individually and as parent of Robert Schafer and Tamera Schafer; Surrey Public School District # 41 and the following taxpayers and parents residing in and their children enrolled in Surrey Public School District # 41: Wayne Lukenbach and Roberta Lukenbach, individually and as parents of Gregory Lukenbach; Linda Jung and Gary Jung, individually and as parents of Ezra Jung, Aaron Jung, Nathan Jung, Daniel Jung and David Jung; West Fargo Public School District # 6 and the following taxpayers and parents residing in and their children enrolled in West Fargo Public

School District # 6: Dennis W. Braaten and Carol A. Braaten, individually and as parents of Darcy Lynn Braaten; Roger Larsen and Chris Larsen, individually and as parents of Alexia Larsen, Lindsey Larsen, and Matthew Larsen; Dennis S. Gullickson and Tammy S. Gullickson, individually and as parents of Kelly R. Gullickson; Valley City Public School District # 2 and the following taxpayer and parent residing in and his children enrolled in Valley City Public School District # 2: Luther Skogen, individually and as parent of Sarah Skogen and Matthew Skogen; Grand Forks Public School District # 1 and the following taxpayer and parent residing in and her children enrolled in Grand Forks Public School District # 1: Nikki Seabloom, individually and as parent of Jeff Seabloom and Gregory Seabloom, Plaintiffs and Appellees,

v.

The STATE of North Dakota, acting By and Through The North Dakota Legislative Assembly; Rosemarie Myrdal, President of the Senate; Rick Berg, Speaker of the House of Representatives; Ed Schafer, Governor; Wayne Sanstead, North Dakota Superintendent of Public Instruction; Kathi Gilmore, Treasurer; and Rod Backman, Director of the Office of Management and Budget, Defendants and Appellants.

Civ. No. 930079.

Supreme Court of North Dakota.

Jan. 24, 1994.

Calvin N. Rolfson (argued), of Rolfson Schulz Lervick Law Offices, Bismarck, David C. Long (argued), Mill Valley, CA and Clark J. Bormann (appearance), of Bormann Law Office, Bismarck, for plaintiffs and appellees.

Laurie J. Loveland (argued), Sol. Gen., Mary Norum Hoberg (appearance), Sp. Asst. Atty. Gen., and Karrie Helm (appearance), Legal Asst., Attorney General's Office, Bismarck, for defendants and appellants.

NEUMANN, Justice.

Article VI, Section 4 of the North Dakota Constitution requires at least four members of this Court to declare a statute unconstitutional.[1] Because only three members of this Court have joined in this opinion, the statutory method for distributing funding for primary and secondary education in North Dakota is not declared unconstitutional by a sufficient majority.

We hold that the funding of the previously recognized fundamental constitutional right to education, *see, e.g., State v. Rivinius,* 328 N.W.2d 220 (N.D.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983), and other cases cited herein, is an important substantive right. We further hold that the widely disparate effect of the State's method of accomplishing this important substantive right fails to bear a close correspondence to the achievement of the constitutionally mandated goal of an equal educational opportunity, which was previously recognized by this Court in *Lapp v. Reeder Public School District,* 491 N.W.2d 65, 67 (N.D.1992), and in *In Interest of G.H.,* 218 N.W.2d 441, 447 (N.D. 1974).

In this appeal, we consider the constitutionality of North Dakota's statutory method

---

1. Art. VI, § 4, N.D. Const., provides:
   "A majority of the supreme court shall be necessary to constitute a quorum or to pronounce a decision, provided that the supreme court shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide."

for distributing funding for public elementary and secondary schools. The trial court held that the distribution method was unconstitutional and retained jurisdiction to monitor and enforce compliance with its decision. We affirm the trial court's declaration that the distribution method, as a whole, is unconstitutional, but we reverse the court's retention of jurisdiction.

In June 1989, nine public high school districts and thirty-one resident taxpayers and parents of children who attend public school in those districts [hereinafter collectively referred to as plaintiffs], brought this action for declaratory relief against the State and the legislative and executive officials constitutionally charged with establishing and maintaining North Dakota's public elementary and secondary schools [hereinafter collectively referred to as defendants]. The plaintiffs challenged the constitutionality of the statutory method for distributing funding to public schools, alleging it was based predominantly upon each school district's property tax base, which resulted in these nine "property poor" school districts and their pupils receiving fewer educational resources per pupil than "property wealthy" school districts. The plaintiffs alleged that the statutory method for distributing funding for education, as a whole, failed to equalize local property tax disparities and resulted in substantial inequities in educational opportunities in property poor districts in violation of the education [Article VIII, §§ 1 and 2], and equal protection [Article I, §§ 21 and 22], provisions of the North Dakota Constitution.

The district court held that the statutory method for distributing funding for education violated both the education and the equal protection provisions of our state constitution, and retained jurisdiction to monitor the enactment of a constitutional method for distributing funding. The defendants appealed.

I

Relying on *Dickinson Pub. School Dist. v. Sanstead,* 425 N.W.2d 906 (N.D.1988), and *County of Stutsman v. State Historical Society,* 371 N.W.2d 321 (N.D.1985), the defendants assert that the nine school districts, as political subdivisions, do not have standing to challenge the constitutionality of the statutory method for distributing funding for public education.

In *Sanstead,* this court concluded that NDCC ch. 15–40.1 [State School Aid] did not create an express contract between the State and local school districts for state foundation aid. We thus held that a school district's action against the State for "compensatory damages" for the alleged failure to properly calculate past foundation aid payments was not one arising upon contract and was barred by the doctrine of sovereign immunity. We indicated that "state aid to local school districts is a mere gratuity." *Sanstead, supra,* 425 N.W.2d at 910. *See also Zenith School District No. 32 v. Peterson,* 81 N.W.2d 764, 768 (N.D.1957). In *County of Stutsman,* this court held that Stutsman County, as a political subdivision of the state, could not successfully assert that the state had violated its constitutional rights, because a county is a creature of the constitution and is not a person or private party under the applicable constitutional provisions.

School districts are political subdivisions created by the state. *Baldwin v. Board of Education,* 76 N.D. 51, 33 N.W.2d 473 (1948); NDCC § 15–47–43. For purposes of challenging the constitutionality of the statutory method for distributing funding for education, *County of Stutsman* and *Sanstead* suggest that the nine plaintiff school districts do not have standing to raise those issues. *But see Application of Otter Tail Power Co.,* 451 N.W.2d 95, 97 (N.D.1990), and *State v. Woodworth,* 234 N.W.2d 243, 249 (N.D.1975) ["weighty countervailing policies" may authorize standing to assert another party's rights]. *See also Metropolitan Sports Facilities Commission v. County of Hennepin,* 451 N.W.2d 319, 321 (Minn.1990) [case must involve "substantial public interest" for governmental unit to have standing to challenge constitutionality of statute under which it operates]. However, the defendants concede that the remaining plaintiffs have standing to challenge the constitutionality of the statutory method for distributing funding for education. Accordingly, it is not necessary for us to resolve the standing issue.

## II

Before evaluating the parties' constitutional arguments, we trace the contours of the statutory method for distributing funding for public elementary and secondary education in North Dakota, keeping in mind that the State is responsible for implementing our public school system, and that all taxes for education purposes, including local property taxes, are State taxes. *Dornacker v. Olson,* 248 N.W.2d 844 (N.D.1976); *State ex rel. Haig v. Hauge,* 37 N.D. 583, 164 N.W. 289 (1917).

### A.

North Dakota has four types of school districts: high school districts which offer instruction in kindergarten through twelfth grade; elementary districts which offer instruction in kindergarten through sixth or eighth grade; rural districts which usually offer instruction to small enrollments in one classroom with one teacher; and nonoperating districts which do not offer instruction and which pay tuition for children residing within their borders to attend school in a neighboring district.

During the 1990–1991 school year, approximately 118,000 students attended public elementary and secondary schools in 269 school districts in North Dakota. Total enrollments ranged from 10,625 students in the Bismarck high school district to no students in some nonoperating districts. The plaintiff school districts generally have some of the state's largest total enrollments with Bismarck, 1st with 10,625 students; Grand Forks, 3rd with 9,227 students; West Fargo, 5th with 4,267 students; Mandan, 6th with 3,589 students; Dickinson, 7th with 3,144 students; Devils Lake, 10th with 2,016 students; Valley City, 13th with 1,399 students; Grafton, 14th with 1,153 students; and Surrey, 58th with 382 students.

The statutory method for distributing funding for public schools uses a mix of revenues from state, local, and federal sources. The trial court found that, excluding $26 million in federal revenue earmarked for specific purposes, school districts in North Dakota incurred approximately $417 million in operating expenses during the 1990–1991 school year. Of that $417 million, state sources of revenue were $220 million (52.8%), school district sources of revenue were $182 million (43.6%), county sources of revenue were $8.6 million (2.1%), and unrestricted federal sources of revenue were $6 million (1.5%).[2]

The two primary sources of funding for education are a local ad valorem property tax and state foundation aid. During the 1990–1991 school year, local property taxes generated about 82% of the $182 million in local revenue and state foundation aid constituted about 76% of the $220 million in state revenue.

The local property tax is levied on each school district's taxable property value as assessed and equalized by each county. *See* NDCC §§ 57–15–14 through 57–15–14.4. North Dakota school districts vary widely in the value of assessed property per pupil and in the tax burden on district residents. As a result of those variations, some "property wealthy" school districts can raise more revenue per pupil with a smaller mill levy than other "property poor" school districts.

During the 1991–1992 school year, the value of assessed property per pupil ranged from $77,745 per pupil in the Spiritwood school district to $145 per pupil in the Belcourt school district, and the mill levies ranged from 261.07 in the Bell elementary school district to zero in the Belcourt high school district, the Twin Buttes elementary district, and the Earl, Horsecreek, and Springbrook rural districts. Five non-operating districts also had a mill levy of zero. During that year, the statewide average taxable property value was $7,870 per pupil and the mean average mill levy for all school districts was 186.89. All of the plaintiff school districts had lower assessed property

---

2. Federal sources of revenue include: (1) federal "874" impact aid (Public Law 81–874, 20 U.S.C. § 240); (2) federal funds under an act to promote the mining of coal on the public domain (NDCC § 15–40.1–13; 30 U.S.C. § 181 et seq.);

(3) federal funds under the Taylor Grazing Act (43 U.S.C. § 315i); and (4) miscellaneous other sources such as Johnson–O'Malley funds (25 U.S.C. §§ 452–457).

values per pupil and higher mill levies than the state averages. The plaintiff school districts' assessed value of property per pupil and school mill levies were: Bismarck—$6,172 per pupil and 248.68 mills; Devils Lake—$5,541 per pupil and 190.74 mills; Dickinson—$4,293 per pupil and 227.97 mills; Grafton—$6,802 per pupil and 221.56 mills; Grand Forks—$7,031 per pupil and 226.52 mills; Mandan—$5,795 per pupil and 187.57 mills; Surrey—$3,655 per pupil and 213.66 mills; Valley City—$6,401 per pupil and 209.51 mills; and West Fargo—$7,457 per pupil and 225.17 mills.

The other major source of state funds for education, foundation aid, is distributed by the State to school districts through the statutory formula outlined in NDCC ch. 15–40.1. Each district's net entitlement to foundation aid is calculated by determining the district's gross entitlement[3] to foundation aid and subtracting a "deduct." The "deduct" for the 1990–1991 school year was the product of 22 mills times the "latest available net assessed and equalized valuation of property of the school district." NDCC § 15–40.1–06(3).[4] Because the deduct is based on the assessed property value in each district, it allows a greater reduction in total foundation aid for districts with higher assessed property values than for districts with lower assessed property values. The effect of the greater reduction in foundation aid for property wealthy districts provides some slight equalization of the money available for education expenditures in all districts.

Under NDCC ch. 15–44, the State also distributes tuition apportionment funds to local school districts from a "state tuition fund," which is "[t]he net proceeds arising from all fines for violation of state laws, from leasing the school lands, and the interest and income from the state permanent school fund." NDCC § 15–44–01. The "state tuition fund" is distributed to school districts on a per pupil basis, and, in recent years, school districts have received the flat amount of approximately $200 per pupil from that fund.

The State reimburses school districts for transportation costs under a statutory formula which is based on the size of buses, the miles transported, and the number of pupils. NDCC §§ 15–40.1–15 through 15–40.1–18. The application of that formula results in the State reimbursing some school districts more than their actual transportation costs while reimbursing other districts substantially less than their actual transportation costs.

Special education is funded by distributions from the state and federal government and, upon a majority vote, school districts may also impose a tax levy for special education. NDCC chs. 15–59 and 15–59.2. The State also distributes funding for vocational educational programs under NDCC chs. 15–20.1 and 15–20.2, and for school activity and school lunch programs under NDCC ch. 15–54.

Other sources of state revenue for education are a coal conversion tax on plants that convert coal into electricity [NDCC ch. 57–60]; a coal severance tax [NDCC chs. 57–61 and 57–62]; an oil and gas gross production tax [NDCC ch. 57–51]; an oil extraction tax [NDCC ch. 57–51.1]; and a tax on mutual and cooperative telephone companies [NDCC ch. 57–34]. Those taxes are "in lieu" of property taxes on the minerals or facilities involved, and the State distributes a portion

---

3. A district's "gross entitlement" to foundation aid is calculated by multiplying "educational support per pupil," which the Legislature set at $1,552 per pupil for the first year of the 1991–1993 biennium and at $1,608 for the second year, times the district's "weighted pupil units." A district's weighted pupil units are calculated by multiplying the larger of the district's average daily membership during the previous school year or fall enrollment for the current year times weighting factors or "cost indices" for each student. The "cost indices" are calculated by multiplying the number of students in each grade by a cost index for that grade and by totaling those figures to establish the district's "weighted pupil

units." See NDCC §§ 15–40.1–07 through 15–40.1–08.

4. The "deduct" was set at 20 mills from 1973 until the 1989–1990 school year. During the 1989 legislative session, the Legislature raised the deduct to 21 mills for the 1989–1990 school year and to 22 mills for each year thereafter. 1989 N.D.Sess.Laws, ch. 213, § 2. During the 1993 legislative session, the Legislature raised the deduct to 23 mills for the 1993–1994 school year and to 24 mills for each year thereafter. 1993 N.D.Sess.Laws, ch. 3, § 19.

of those tax revenues to school districts in the counties where the taxes originate.

As a result of disparities in the assessed value of property, mill levies, and the number of students in each district, there are disparities between school districts in the amount of money available for per pupil expenditures. During the 1990–1991 school year, the disparities in expenditures ranged from $11,743.28 per pupil in the Twin Buttes elementary school district to $2,085.97 per pupil in the Salund rural school district. In the 209 high school districts, the disparities ranged from $8,554.94 per pupil in the Fort Totten district to $2,306.26 per pupil in the United district. The mean expenditure in the high school districts was $3,692.58 per pupil. In the 48 elementary school districts, the disparities ranged from $11,743.28 per pupil in the Twin Buttes district to $2,173.12 per pupil in the Mapleton district. The mean expenditure in the elementary districts was $4,360.49 per pupil. In the 12 rural districts, the disparities ranged from $8,486.60 per pupil in the Earl district to $2,085.97 per pupil in the Salund district. The mean expenditure in the rural districts was $4,434.41 per pupil. The mean average expenditure for all school districts in the 1990–1991 school year was $3,425.12 per pupil.

During the 1990–1991 school year, all of the plaintiff school districts had per pupil expenditures below the state average. Their per pupil expenditures were $2,948.83 in Bismarck; $2,806.18 in Devils Lake; $2,869.22 in Dickinson; $2,709.46 in Grafton; $3,178.34 in Grand Forks; $2,547.44 in Mandan; $2,317.82 in Surrey; $2,614.36 in Valley City; and $2,576.20 in West Fargo.

B.

Within that statutory framework for distributing funding for education and the state-

wide disparities in expenditures per pupil, mill levies, and assessed values per pupil, we now consider the parties' constitutional arguments.

The plaintiffs argue that the impact of the statutory method for distributing funding for public education, as a whole, does not provide a "uniform system of free public schools throughout the state" under the education provisions of our state constitution, Art. VIII, §§ 1 and 2, N.D. Const.[5] The plaintiffs concede that the education provisions do not require equal dollars in per pupil funding throughout the state, but argue that the education provisions require the Legislature to distribute funding for public schools so that students throughout the state receive an "equal education opportunity."

The defendants respond that a "uniform system of free public schools" is satisfied by the Legislature's creation of school districts and by the implementation of a uniform system of schools in those districts, which, they contend, is achieved through curriculum requirements and accreditation standards. The defendants assert that the education provisions do not mandate any particular type, or level, of funding for public education. They argue that, in the absence of evidence that the statutory method for distributing funding for public education deprives any children either of access to an education, or of an adequate education, the funding method satisfies the education provisions.

However, the parties agree mere uniformity alone does not fully define the Legislature's constitutional obligation under the education provisions. The defendants admit a uniformly inadequate system would not satisfy the education provisions and argue that

---

5. The education provisions provide:

"Section 1. A high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people being necessary in order to insure the continuance of that government and the prosperity and happiness of the people, *the legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control.* This legislative requirement shall

be irrevocable without the consent of the United States and the people of North Dakota.

"Section 2. *The legislative assembly shall provide for a uniform system of free public schools throughout the state,* beginning with the primary and extending through all grades up to and including schools of higher education, except that the legislative assembly may authorize tuition, fees and service charges to assist in the financing of public schools of higher education." [Emphasis added].

state equal protection analysis is the appropriate analytical framework for addressing the uniformity issue. The plaintiffs admit educational opportunities are not totally inadequate, and they also rely upon our state equal protection provisions. We therefore consider the parties' equal protection arguments.

## C.

In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the United States Supreme Court considered a federal equal protection challenge to disparities resulting from the method of distributing funding for education in Texas. The Supreme Court concluded that, under the federal equal protection clause, strict scrutiny was not applicable to the Texas financing scheme, because education was not a fundamental right guaranteed by the United States Constitution, and because wealth was not a suspect classification. The Court thus analyzed the Texas financing scheme under the rational basis standard and held that it was rationally relat-

ed to a legitimate state purpose of local control.

■ Although *Rodriguez* governs equal protection analysis of school financing under the federal constitution, we have often recognized that our state constitution may afford broader rights than those granted under the equivalent provision of the federal constitution.[6] *Matter of Adoption of K.A.S.,* 499 N.W.2d 558 (N.D.1993); *Kavadas v. Lorenzen,* 448 N.W.2d 219 (N.D.1989); *Johnson v. Hassett,* 217 N.W.2d 771 (N.D.1974).

■ Long viewed as our state constitutional guarantee of equal protection, Art. I, §§ 21 and 22, N.D. Const., provide:

"*Section 21.* No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.

"*Section 22.* All laws of a general nature shall have a uniform operation."

---

6. Because *Rodriguez* essentially foreclosed federal equal protection challenges to state methods for funding education, litigants in other states have, with varying success, focused on the education or equal protection provisions of their state constitutions to challenge methods for funding public education. *See* Note, *State Constitutional Analyses of Public School Finance Reform Cases: Myth or Methodology?,* 45 Vand.L.Rev. 129 (1991); Note, *To Render Them Safe: The Analysis Of State Constitutional Provisions In Public School Finance Reform Litigation,* 75 Va. L.Rev. 1639 (1989).

Some courts have held that their state education funding systems violate the education provisions, the equal protection provisions, or both provisions, of their state constitutions. *DuPree v. Alma Sch. Dist. No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983); *Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977); *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977); *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186 (Ky.1989); *McDuffy v. Secretary of Executive Office of Education,* 415 Mass. 545, 615 N.E.2d 516 (1993); *Tennessee Small School Systems v. McWherter,* 851 S.W.2d 139 (Tenn.1993); *Helena Elementary Sch. Dist. No. One v. State,* 236 Mont. 44, 769 P.2d 684 (1989); *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (N.J.), *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); *Edgewood Indep.*

*Sch. Dist. v. Kirby,* 777 S.W.2d 391 (Tex.1989); *Seattle Sch. Dist. No. One v. State,* 90 Wash.2d 476, 585 P.2d 71 (1978); *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979); *Washakie County Sch. Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).

Other courts have upheld their education funding systems against state constitutional challenges. *E.g., Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973); *Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005 (Colo.1982); *McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981); *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983); *Skeen et al. v. State of Minnesota et al.,* 505 N.W.2d 299 (Minn.1993); *Board of Educ., Levittown v. Nyquist,* 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982), *appeal dismissed,* 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983); *Board of Educ. of the City School Dist. of Cincinnati v. Walter,* 58 Ohio St.2d 368, 390 N.E.2d 813, 12 O.O.3d 327 (1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Fair School Fin. Council of Oklahoma, Inc. v. State,* 746 P.2d 1135 (Okla.1987); *Olsen v. State,* 276 Or. 9, 554 P.2d 139 (1976); *Danson v. Casey,* 484 Pa. 415, 399 A.2d 360 (1979); *Richland County v. Campbell,* 294 S.C. 346, 364 S.E.2d 470 (1988); *Kukor v. Grover,* 148 Wis.2d 469, 436 N.W.2d 568 (1989).

Those provisions do not prohibit legislative classifications or mandate identical treatment of different categories of persons. They do, however, subject legislative classifications to different standards of scrutiny, depending upon the right that may be infringed by the challenged classification. *E.g., Matter of Adoption of K.A.S., supra.*

In *Gange v. Clerk of Burleigh County District Court,* 429 N.W.2d 429, 433 (N.D.1988), we outlined the standards of judicial scrutiny for equal protection claims under our state constitution:

"When a statute is challenged on equal protection grounds, we first locate the appropriate standard of review. We apply strict scrutiny to an inherently suspect classification or infringement of a fundamental right and strike down the challenged statutory classification 'unless it is shown that the statute promotes a compelling governmental interest and that the distinctions drawn by the law are necessary to further its purpose.' *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621, 627 (N.D.1977). When an 'important substantive right' is involved, we apply an intermediate standard of review which requires a ' "close correspondence between statutory classification and legislative goals." ' *Hanson v. Williams County,* 389 N.W.2d 319, 323, 325 (N.D.1986) [quoting *Arneson v. Olson,* 270 N.W.2d 125, 133 (N.D.1978)]. When no suspect class, fundamental right, or important substantive right is involved, we apply a rational basis standard and sustain the legislative classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose. *See State v. Knoefler,* 279 N.W.2d 658, 662 (N.D.1979)."

The parties agree that the right to education is a fundamental right under the North Dakota Constitution. *See, e.g., Lapp v. Reeder Public School District,* 491 N.W.2d 65 (N.D.1992); *State v. Rivinius,* 328 N.W.2d 220 (N.D.1982), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *State v. Shaver,* 294 N.W.2d 883 (N.D.1980); *In Interest of G.H.,* 218 N.W.2d 441 (N.D.1974). *Compare Rodriguez, supra* [education is not

a fundamental right under federal constitution].

The plaintiffs thus assert that strict scrutiny applies to the statutory method for distributing funding for the fundamental right to education. *See Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977); *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979); *Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 (1976), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977); *Washakie Co. School Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).

In *Matter of Adoption of K.A.S., supra,* we considered a state equal protection challenge to a statutory scheme which authorized court-appointed counsel for indigent parents facing termination of parental rights in a proceeding under the Uniform Juvenile Court Act and the Uniform Parentage Act, but not for indigent parents facing termination of parental rights in an adoption proceeding. NDCC § 14–15–19(6). We applied strict scrutiny to that classification because it *impaired* the parents' exercise of their fundamental right to parent their children. 499 N.W.2d at 565. We concluded that conserving fiscal resources was not a compelling state interest which justified impairment of a parent's fundamental right to parent. In order to avoid that constitutional infirmity, we construed NDCC § 14–15–19(6), to require appointment of counsel for indigent parents facing termination of parental rights in an adoption proceeding, unless the right was waived.

The equal protection challenge in this case involves financing of the fundamental right to education. The parties agree that the statutory method of distributing funding for that fundamental right results in disparities in expenditures per pupil. Those relative funding disparities may well *impair* the fundamental right to education. However, we agree with the rationale of those courts that, while recognizing the importance of education, have concluded that legislative determinations about the financing mix for education involve difficult questions of local and statewide taxation, fiscal planning, and edu-

cation policy, which are ill-suited for strict scrutiny analysis. *See Lujan v. Colorado State Bd. of Education,* 649 P.2d 1005 (Colo. 1982); *McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981); *Hornbeck v. Somerset County Bd. of Education,* 295 Md. 597, 458 A.2d 758 (1983); *Bd. of Education, Levittown v. Nyquist,* 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982), *appeal dismissed,* 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983); *Board of Educ. of the City School Dist. of Cincinnati v. Walter,* 58 Ohio St.2d 368, 390 N.E.2d 813, 12 O.O.3d 327 (1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980). We do not believe that legislative decisions balancing those difficult issues require equal per pupil dollars for education funding, or a perfect solution in order to withstand equal protection analysis. Subjecting the entire method of financing education to the exacting level of strict scrutiny would essentially require the judiciary to micro-manage and second guess difficult policy decisions in the legislative arena. In a state with our demographic characteristics, we believe the Legislature must have some flexibility to relate funding to numerous variables involved with the actual cost of educating pupils in the different school districts. In the absence of a substantial deprivation of the fundamental right to education, those demographic characteristics and variables may result in some funding disparities which do not violate equal protection. We therefore decline to apply the rigorous and exacting standards of strict scrutiny to disparities in education funding, and we conclude that strict scrutiny is not applicable to this equal protection challenge.

However, unlike those jurisdictions which have concluded that strict scrutiny is not applicable to state equal protection challenges to financing education and have thus analyzed the issue under the rational basis standard, our state equal protection cases also require consideration of the intermediate level of heightened scrutiny for important substantive rights. *E.g., Hanson v. Williams County,* 389 N.W.2d 319 (N.D. 1986). *Compare Rodriguez; Lujan; McDaniel; Hornbeck; Nyquist; Walter. See also Skeen et al. v. State of Minnesota et al.,* 505 N.W.2d 299 (Minn.1993) [although

strict scrutiny applies in determining whether the Legislature has met a student's fundamental right to a general and uniform system of public schools, rational basis applies to determining whether financing of the system is thorough and efficient].

■ In *Kavadas v. Lorenzen,* 448 N.W.2d 219, 222–223 (N.D.1989), we explained our rationale for choosing between the intermediate level of scrutiny and the rational basis standard of review:

"*Hanson* follows our equal protection cases in which we have generally applied the intermediate level of scrutiny to classifications which have completely prevented a class of injured persons from maintaining an action to recover for their injuries. *Bellemare v. Gateway Builders, Inc.* [420 N.W.2d 733 (N.D.1988) ] *supra* [intermediate level of scrutiny applicable to statute that prevented a class of plaintiffs from suing for damages for any deficiency in the design, planning, supervision or observation of construction, or construction of an improvement to real property]; *Patch v. Sebelius,* 320 N.W.2d 511 (N.D.1982) [intermediate level of scrutiny applicable to statute that prevented a class of plaintiffs from suing the state or a state agency]; *Benson v. North Dakota Workmen's Compensation Bureau,* 283 N.W.2d 96 (N.D. 1979) [intermediate level of scrutiny applicable to statute that excluded a class of employees from workmen's compensation]; *Herman v. Magnuson,* 277 N.W.2d 445 (N.D.1979) [intermediate level of scrutiny applicable to statute that prevented a class of plaintiffs from suing a municipality for defective streets or bridges]; *Johnson v. Hassett,* 217 N.W.2d 771 (N.D.1974) [intermediate level of scrutiny applicable to automobile guest statute that prohibited a class of plaintiffs from suing for ordinary negligence of host].

"In contrast, we have generally applied the rational basis test to statutory classifications which involve economic or social matters and do not deprive a class of plaintiffs from access to the courts. *Mauch v. Manufacturers Sales & Service, Inc.,* 345 N.W.2d 338 (N.D.1984) [rational basis test applicable to comparative negligence provi-

sions of Section 9–10–07, N.D.C.C.]; *Law v. Maercklein,* 292 N.W.2d 86 (N.D.1980) [rational basis test applicable to statute allowing only residents to participate in the Unsatisfied Judgment Fund]; *Tharaldson v. Unsatisfied Judgment Fund,* 225 N.W.2d 39 (N.D.1974) [rational basis test applicable to statute limiting recovery from Unsatisfied Judgment Fund to $5,000 in cases in which the tortfeasor can not be ascertained, while permitting a $10,000 recovery from the Fund in other cases]."

We have also applied the intermediate level of heightened scrutiny to a classification involving homestead rights, which, like education, have state constitutional underpinnings [*Mund v. Rambough,* 432 N.W.2d 50 (N.D.1988) ] and to a classification involving a defendant's wealth and the vital interests in presenting a defense to a criminal prosecution for issuing checks without sufficient funds. *State v. Fischer,* 349 N.W.2d 16 (N.D. 1984); *State v. Carpenter,* 301 N.W.2d 106 (N.D.1980).

■ The defendants argue that the funding of education should not be analyzed under heightened scrutiny, because the plaintiffs' claims are based on relative disparities in the amount of funding for education and not on the absolute deprivation of the fundamental right to education. *See, e.g., Rodriguez, supra; Skeen, supra.* They argue that differences in the relative level of expenditures per pupil do not translate into inferior educational opportunities and do not affect educational outcomes. Relying on *Kadrmas v. Dickinson Public Schools,* 402 N.W.2d 897 (N.D.1987), *aff'd* 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988), the defendants argue that education funding involves "classic" social and economic legislation, which is scrutinized under the rational basis standard rather than under heightened scrutiny.

In *Kadrmas,* this court considered education and equal protection provision challenges to NDCC § 15–34.2–06.1, which authorized nonreorganized school districts to charge patrons for transportation to and from schools. We held that school districts are not required to provide students with free transportation, because that service is not "essential" to a "uniform system of free public schools." *See Cardiff v. Bismarck Public School Dist.,* 263 N.W.2d 105, 113 (N.D.1978) [free public schools means those items which are "essential to education"].

In analyzing the state and federal equal protection challenge to NDCC § 15–34.2–06.1, a majority of this court concluded the statute was "purely economic legislation which neither involves a suspect classification, nor a fundamental right or important substantive right which would require the strict scrutiny or intermediate standard of review." *Kadrmas, supra,* 402 N.W.2d at 902. The majority thus reviewed that statute under the rational basis standard and concluded it was rationally related to the legitimate governmental objectives of allocating limited financial resources and of providing incentives for school district reorganization. The majority held that the statute did not violate the equal protection provisions of the state or federal [7] constitutions.

The dissent determined that the statute involved access to the fundamental right of education, which was an "important substantive right," warranting the intermediate standard of scrutiny under our state equal protection provisions. *Id.* at 904–905 (Levine, Justice, concurring and dissenting). The dissent concluded there was no close correspondence between the statutory classification and the legislative goal of conserving and allocating financial resources.

We do not believe *Kadrmas* is determinative of the level of scrutiny applicable to the effect of the entire statutory method for distributing funding for public education. *Kadrmas* involved transportation charges, a service which this court held was not an essential element of a "uniform system of free public schools." Here, the equal protection challenge involves the effect of the entire statutory method for distributing funding for the "uniform system of free public schools" which obviously entails funding for some "es-

---

**7.** The United States Supreme Court affirmed our decision under the federal equal protection clause. *Kadrmas v. Dickinson Public School Dist.,* 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

sential" components of the "uniform system of free public schools." We therefore conclude that *Kadrmas* is not determinative of the level of scrutiny applicable to this equal protection challenge.

Funding of education involves more than social and economic matters like a day of rest, recreation and Sunday closing of businesses [*Best Products Co., Inc. v. Spaeth*, 461 N.W.2d 91 (N.D.1990)], or the allocation of damages in tort reform cases. *E.g. Kavadas v. Lorenzen, supra.* Although the distribution of funding for public education involves money and economic consequences, the focus must be on the rights affected and the individual interests involved. *See Vantage, Inc. v. Carrier Corp.*, 467 N.W.2d 446, 448 (N.D. 1991); *Hanson v. Williams County, supra*, 389 N.W.2d at 325. Here, those rights and interests support use of the intermediate level of scrutiny.

The education provisions of our state constitution have "at least equal standing" with the guarantees of freedom of religion and freedom of speech and press, and the State has a compelling interest in establishing minimum standards of education to ensure that our children receive an adequate education. *State v. Rivinius, supra*, 328 N.W.2d at 228. Funding of education promotes "[a] high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people ... to insure the continuance of that government and the prosperity and happiness of the people" [Art. VIII, § 1, N.D. Const.] and is essential to the practical realization of the fundamental right enumerated in our state constitution: the right to a "uniform system of free public schools throughout the state" which "shall be open to all children of the state of North Dakota." Art. VIII, §§ 1 & 2, N.D. Const. In order to meet those state constitutional requirements, the funding of education must be at least on par with the right to bring a personal injury lawsuit [*e.g., Hanson v. Williams County, supra*], and homestead rights. *Mund v. Rambough, supra.*

Although the statutory method for distributing funding for education may not totally deprive any student of access to the fundamental right to education, we believe the method of distributing funding for that fundamental right involves important substantive matters similar to those rights involved in cases in which we have applied the intermediate level of scrutiny. Accordingly, we analyze these equal protection claims under the intermediate level of scrutiny, and we require the distribution of funding for education to bear a close correspondence to legislative goals. *E.g., Hanson v. Williams County, supra.*

The Legislature has identified an educational funding goal to "support elementary and secondary education in this state from state funds based on the educational cost per pupil." NDCC § 15–40.1–06(1). We have also construed our state education and equal protection provisions to entitle children throughout North Dakota to an "equal education opportunity." *Lapp v. Reeder Public School Dist.*, 491 N.W.2d 65, 67 (N.D.1992); *In Interest of G.H.*, 218 N.W.2d 441, 447 (N.D.1974).

■ The State is responsible for implementing our public school system, and the Legislature is authorized to provide for the maintenance of that system through a state or legislative levy of taxes, or through a mandatory local tax levy. *Dornacker v. Olson*, 248 N.W.2d 844 (N.D.1976). All taxes for education purposes, including local property taxes, are State taxes. *Id.; State ex rel. Haig v. Hauge*, 37 N.D. 583, 164 N.W. 289 (1917).

■ In this case, the overall effect of the Legislature's statutory method for funding education authorizes the distribution of funding primarily on the basis of property wealth in the different school districts throughout the state. That distribution is not necessarily related to any aspect of educational needs, or educational cost per pupil, and, as a whole, fails to bear a close correspondence either to the constitutional mandate to provide an equal educational opportunity, or to the legislative goal of "support[ing] elementary and secondary education in this state from state funds based on the educational cost per pupil." NDCC § 15–40.1–06(1).

The lack of a close correspondence to those goals centers on the 22 mill deduct in NDCC

§ 15–40.1–06(3)(a). *See* fn. 4. A deduct at that level fails to achieve any reasonable degree of state equalization of disparities in per pupil expenditures and places an even greater reliance on unequalized school district tax bases, which allows property wealthy districts to use their property wealth to outstrip expenditures per pupil in property poor districts.

The equalizing effect of the deduct has deteriorated over the last twenty years. In 1973, the deduct was 20 mills and was supplemented by a 21 mill equalizing county levy for education. That levy was collected on all real property in the county and was distributed to school districts in the county based on the district's number of students. However, this equalizing county levy was repealed in 1981. 1981 N.D.Sess.Laws, ch. 198. In 1973, the 20 mill deduct and the 21 mill county levy equalized about two-thirds of the statewide average school levy of 65 mills. In the 1991–1992 school year, our state foundation aid payments were equalized only to the extent of the 22 mill deduct, while the statewide average mill levy for education exceeded 186 mills. *Compare Skeen, supra* [Minnesota education funding system did not violate education and equal protection provisions where approximately 93% of revenues generated by funding system were equalized by state law and approximately seven percent were unequalized and subject to local control].

In the 1973–1974 school year, foundation aid and tuition apportionment represented about 69% of the statewide average expenditure per pupil. In the 1981–1982 school year, foundation aid and tuition apportionment represented about 64% of the statewide average expenditure per pupil. By the 1990–1991 school year, foundation aid and tuition apportionment represented only about 46% of the statewide average expenditure per pupil. The net result of the low deduct is that its capacity for equalization has been dramatically reduced over the last 20 years to the point where the majority of revenues are no longer equalized by state aid.

The deduct also fails to treat the coal conversion and severance taxes, the oil and gas production and extraction taxes, and the telephone tax, all of which are "in lieu" of property tax revenues, as if they were part of the local tax base for equalization purposes. That failure results in further disparate treatment and impact on the state's overall method of distributing funding for education.

The statutory method of distributing funding for education also allows some school districts to receive state reimbursement for transportation costs which exceed their actual costs while other districts receive less than half of their actual costs. That disbursement is totally unrelated to educational costs per pupil and does not bear a close correspondence to the constitutionally mandated goal of an equal educational opportunity, nor to the Legislature's goal to "support elementary and secondary education in this state from state funds based on the educational cost per pupil." NDCC § 15–40.1–06(1).

We are not persuaded that local control of education justifies the disparities in per pupil expenditures exhibited in this case.[8] An element of local control is clearly a useful and desirable aspect of any education system. However, local control in North Dakota is undercut and limited by the Legislature's enactment of requirements for statewide uni-

8. A number of other jurisdictions have upheld state education financing systems challenged on equal protection grounds after subjecting those funding systems to the "rational basis" test. As in *Rodriguez,* those courts have concluded that spending disparities between school districts were rationally related to the legitimate governmental objective of local control. *See, e.g., Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005 (Colo.1982); *Bd. of Education, Levittown v. Nyquist,* 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982), *appeal dismissed,* 459 U.S. 1138, 103 S.Ct. 775, 74 L.Ed.2d 986 (1983). *See also McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981); *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *Hornbeck v. Somerset County Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983); *Skeen et al. v. State of Minnesota et al.,* 505 N.W.2d 299 (Minn.1993); *Board of Educ. of the City School Dist. of Cincinnati v. Walter,* 58 Ohio St.2d 368, 390 N.E.2d 813, 12 O.O.3d 327 (1979), *cert. denied,* 444 U.S. 1015, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Fair School Fin. Council of Oklahoma, Inc. v. State,* 746 P.2d 1135 (Okla.1987); *Olsen v. State,* 276 Or. 9, 554 P.2d 139 (1976); *Kukor v. Grover,* 148 Wis.2d 469, 436 N.W.2d 568 (1989).

formity of education.[9] The present method of distributing funding for education fails to offer any realistic local control to many school districts, because it fails to provide many local school boards with a means to generate the funding needed to provide educational opportunities similar to those in other districts, and it fails to give local school boards any realistic credit for the local taxation efforts their patrons bear. *See Dupree v. Alma School Dist. No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983), and *Tennessee Small School Systems v. McWherter,* 851 S.W.2d 139 (Tenn.1993) [local control does not provide rational basis for educational funding disparities].

Rather than selectively reweigh the evidence, we accept the trial court's determinations that the lack of substantially uniform funding has created seriously adverse educational consequences. In other words, relative differences in funding significantly interfere with some children's right to an education. We summarize the findings about those adverse educational consequences.

Property wealthy districts have lower pupil to teacher ratios in all sizes of districts. (Trial Court Findings of Fact 216, 217). Those districts have substantially higher revenues per pupil and provide their children with substantially more favorable teacher ratios. Teacher-pupil ratios range from 58.5 teachers per 1,000 pupils in grades one through six in the lowest revenue group, compared to 90.9 teachers per 1,000 for those grades in the highest revenue group of districts. There is a clear correlation between revenues and the ratio of teachers to pupils. (Finding 218).

To illustrate, the Fargo school district has greater access to taxable wealth than does neighboring West Fargo, both urban districts. Fargo annually spends over $1,000 per pupil more than West Fargo for an average of over $25,000 more per class room of twenty-five students. (Finding 236). The Crosby district is able annually to spend over $1,300 more per pupil than the Surrey district with a comparable number of pupils, an average of over $32,500 more per classroom. The Billings County district has an educational purchasing power that is annually $5,000 per pupil more than the Bell School District with a comparable number of pupils, an exorbitant average of over $125,000 more per classroom. (Finding 236). These disparities in dollars cause disparate educational opportunities.

The trial court found that property poor districts have a larger number of pupils per classroom than wealthy districts. Larger classes complicate instruction and interfere with educational goals by emphasizing efficiency over effectiveness. (Finding 266). Maximum class sizes allowed under the state accreditation standards are often exceeded at all levels in elementary, junior high, and senior high schools in poor districts. (Findings 266–282). Class size adversely affects student's educational opportunities. (Finding 273).

Funding disparities cause other deficiencies: reduced curriculums; unavailability of textbooks; use of outdated textbooks; shortages and lack of equipment, supplies, and materials; spartan physical education programs; science laboratories without equipment; and lack of libraries. (Findings 283–342).

Many elementary schools do not have a library. (Finding 293). In one poor district, teachers supplement their outdated textbooks by purchasing scholastic magazines at their own personal expense. (Finding 306). Lack of a library is an inequity of major proportions, depriving students of the essential skills of research, self direction, and independent learning. (Finding 317).

---

9. Those legislative requirements include compulsory school attendance [NDCC ch. 15–34.1]; teachers' certification [NDCC ch. 15–36] with minimum education requirements [NDCC §§ 15–41–25, 15–47–46]; minimum elementary and high school curriculum requirements [NDCC §§ 15–38–07, 15–41–24, 15–45–02]; minimum number of school days for each year [NDCC § 15–47–33, 15–45–02]; class requirements for units of credit [NDCC § 15–41–06]; and health and safety requirements [NDCC chs. 15–35, 18–12, and NDCC § 15–45–02]. Public schools suffer financial penalties if they fail to meet statutory approval requirements, specifically foundation aid payments are reduced. NDCC § 15–40.1–06.

Poor districts also have distinctly lower ratios of counselors (Finding 221), librarians (Finding 222), and guidance counselors (Finding 223), frequently below accreditation standards. Other poor districts have fewer or no instructors in art, music, foreign language, and physical education. (Finding 244). Also, in some poor districts, buildings and physical facilities are overcrowded, deteriorating, and unsafe. (Findings 379–408).

All of the complaining districts have curtailed or virtually eliminated staff development due to lack of funds, although the trial court found as a fact that "a teacher who takes a course in more effective teaching and applies that information is likely to be a better teacher." (Finding 344). Although special education programs are mandated by state and federal law, and although the number of special education students has been increasing, statewide reimbursement for these programs has decreased from 35% in 1985–1986 to 26% in 1989–1990, intensifying problems for poor districts. (Findings 345–360). Some districts receive reimbursement of significantly more money than they actually spend for transportation of students, up to 150% of their actual expenses, while other districts receive only 40–45% reimbursement. (Findings 370–378). These uneven variations in funding add to the lack of uniformity in educational opportunities.

Accreditation is one measure of compliance with minimum standards within each school. (Finding 413). Because of funding shortages, some districts are not accredited by the North Central Association. Other poor districts are deficient and facing disaccreditation because of recommendations that are beyond their financial resources. (Findings 409–429). However, accreditation assures only uniformity in some basic elements, and wealthier districts easily meet those standards. (Finding 426). Significantly, districts that had all levels of schools accredited by the North Central Association had significantly higher average test scores at all grade levels. (Finding 428).

In sum, the trial court found that the differentials in current revenues per pupil that exist among North Dakota school districts create a lack of uniformity in education.

(Finding 431). The quality of education strongly correlates with the revenue per pupil that a district has available to purchase educational services, materials, and equipment. (Finding 432). Money makes a difference.

High-spending schools have educational advantages over low-spending schools: better qualified and trained teachers as well as in-service training of staff, better equipment, and adequate facilities that are not overcrowded. (Finding 434). The higher revenues in wealthy districts translate into more staff, better teacher-pupil ratios and programs, and adequate supplies. (Finding 434). Greater funding means that schools do more things educationally, and do them better. (Finding 434).

The distinct advantages to students in wealthy districts, compared to poor districts, permit some children to compete more favorably for access to post-secondary training and for jobs, and create life-long advantages for some students in wealthy districts, and life-long deficits for others in poor districts. (Finding 447). The existing school finance system in North Dakota has systematically created and continues significantly unequal educational access and opportunities, stemming from lower per pupil expenditures due to property wealth variations. These serious educational disadvantages for some children are only explained by the lack of uniformity in resources. (Finding 450).

The present educational funding system seriously discriminates against some students and significantly interferes with their right to equality of educational opportunities. Because educational opportunities are not substantially uniform, the existing system of educational funding needs fixing.

We conclude that the effect of the Legislature's statutory method for distributing funding for primary and secondary education in North Dakota, as a whole, does not bear a close correspondence to the goals of providing an equal educational opportunity, and of supporting elementary and secondary education from state funds based on the educational cost per pupil. We do not hold that any one of the various statutes for distribut-

ing funding, by itself, is unconstitutional, or that our constitution requires equal dollar funding per pupil throughout the state. The Legislature must have some freedom to relate funding to the actual costs of educating pupils, and those costs may vary throughout a state with our demographic characteristics. We hold only that the impact of the distribution of funding exhibited in this case does not bear a close correspondence to the goals of providing an equal educational opportunity and of supporting elementary and secondary education from state funds based on educational costs per pupil.

We affirm the district court judgment insofar as the court concluded that the overall impact of the entire statutory method for distributing funding for education in North Dakota is unconstitutional.

### III

■ Although we sustain the district court's determination that the statutory method for distributing funding for education, as a whole, is unconstitutional, we also conclude that the district court erred in mandating specific actions to be taken by the Governor, the Superintendent of Public Instruction, and the Legislative Assembly and its leaders, and in retaining jurisdiction to monitor and enforce compliance with its decision. In view of the separate powers entrusted to the three coordinate branches of government, it is not the usual function of the judiciary to supervise the legislative process in that manner. State v. Sathre, 110 N.W.2d 228 (N.D.1961). The procedure for a declaratory judgment provides an adequate alternative to the court's retention of jurisdiction. Section 32–23–08, N.D.C.C., authorizes "[f]urther relief based on a declaratory judgment or decree ... whenever necessary or proper," but does not necessarily authorize a court to retain jurisdiction of an action to ensure that coordinate branches of government comply with a judicial decision. Because we accord respect to the coordinate branches of government and we trust that they will act to remedy the disparate effects of the statutory method for distributing funding for education, we conclude that the district court erred in mandating specific ac-

tions and in retaining jurisdiction to enforce compliance with its decision. See Odden v. O'Keefe, 450 N.W.2d 707, 710 (N.D.1990) [supreme court declined to issue supervisory writ, because it was "confident that the judges in the Northeast Judicial District will act in light of the principles set forth in this decision"].

Accordingly, we affirm the district court judgment in part and we reverse in part.

MESCHKE and LEVINE, JJ., concur.

SANDSTROM, Justice, dissenting.

We are asked to decide if North Dakota's educational finance system meets the state constitution's requirements that the Legislative Assembly "provide for a uniform system of free public schools," and that "[a]ll laws of a general nature shall have uniform operation."

Because the majority opinion's analysis is seriously flawed, ignoring the clear meaning of the constitutional language, and the opinions of this Court, I dissent.

The district court declared virtually every education finance statute unconstitutional. The majority purports to affirm the district court; yet it declares no statute unconstitutional, but says the "effect" of the education finance system is an unconstitutional result.

There is a fundamental right to education. The plaintiffs, however, have failed to establish any student is being denied that right. They concede all plaintiff districts meet or exceed the educational requirements of the state. The students in North Dakota in general, and in the plaintiff districts, are receiving a good education.

School districts, as political subdivisions of the state, cannot sue the state for "uniform funding." Through lawsuit, taxpayers are not entitled to the same tax burden as different taxpayers. Students deprived of an education can sue to obtain one, but none assert an education is being denied.

Regardless of the flawed logic of the majority, there is no constitutional right to equal education financing.

To claim the constitutional requirements of a uniform system of education requires sub-

stantially the same per pupil spending everywhere in the state ignores the clear words of the constitution. It ignores the words of the drafters as recorded in the proceedings of the Constitutional Convention. It ignores the contemporaneous interpretation of the constitutional language by the First Legislative Assembly. It ignores all the previous holdings of this Court on this issue since statehood.

In citing this Court's decisions holding the right to an education cannot be denied to handicapped children, the majority ignores the rationale of the cases and overstates their holdings as a "constitutionally mandated goal of equal educational opportunity."

The right to an education cannot be denied, but it is absurd to suggest "equal educational opportunity" requires the same educational experience, the same textbooks, the same teachers, the same class options, or the same dollar spending. Students are entitled to the opportunity to receive an education under a uniform system of structure and standards.

The majority seeks to manufacture a new constitutional right where none exists and none was intended. Absent the violation of a legitimate constitutional right, we are not to supplant our judgment for the legislature's.

## I

The majority wrongly states it is unnecessary to resolve the issue of the nine plaintiff school districts' standing to challenge the constitutionality of North Dakota's school financing statutes. The districts lack standing. Their lack of standing is not only important, but the majority must ignore their lack of standing in order to find unconstitutionality.

School districts are political subdivisions of the state created by statute. *See* N.D.C.C. § 15–47–43; *Baldwin v. Board of Education*, 76 N.D. 51, 33 N.W.2d 473, 482 (1948). Political subdivisions created and controlled by the state do not have standing to claim violations of constitutional rights. *County of Stutsman v. State Historical Soc.*, 371 N.W.2d 321 (N.D.1985). In *County of Stutsman*, this Court held:

"A political subdivision, as an agency of the state in the exercise of governmental powers, generally has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of the State.

"In this instance the County, rather than a private person, is the party asserting a violation of its constitutional rights. Stutsman County may not successfully assert a violation of those constitutional rights because it is not a person or private party within the context of those provisions. If Stutsman County has a serious complaint about the burdens placed upon it by this designation under the legislative enactment of chapter 55–10 for preservation of historic sites, the County must take it to the Legislature which controls the County's fate in matters such as this."

*County of Stutsman* at 330 (citations omitted, footnote omitted).

This Court has previously held school districts have no enforceable rights against the state regarding education funding. In *Dickinson Public School Dist. v. Sanstead*, 425 N.W.2d 906 (N.D.1988), this Court held local school districts have no contract rights against the state to foundation aid payments. In *Sanstead*, this Court said, "state aid to local school districts is a mere gratuity." *Sanstead* at 910. *See also Zenith School District No. 32 v. Peterson*, 81 N.W.2d 764, 768 (N.D.1957).

The district court erred when it ignored established North Dakota law and instead applied Minnesota law to find the school districts have standing to assert constitutional claims on their own behalf. *See Metro. Sports Fac. v. County of Hennepin*, 451 N.W.2d 319 (Minn.1990). Since the majority's finding of unconstitutionality is not based on specific claims of any but the school district plaintiffs, the ignoring of established North Dakota law is crucial to its holding.

## II

The first step in analyzing the constitutionality of North Dakota's school finance system is determining what the education clause of our North Dakota Constitution requires.

Does the Constitution require the legislature to create a system of public schools uniform in organizational structure (for example, local school districts and statewide curriculum and accreditation requirements), or must the legislature create a system uniform both in structure and in per pupil funding?

### A

The majority reviews the language of Article VIII, § 2, N.D. Const., and concludes the legislature's obligations under the education clause are not fully defined by "mere uniformity." The majority, however, never explains what is required under Article VIII. Instead, the majority bypasses this step and applies equal protection principles. To determine if the plaintiffs' fundamental right to education is being abridged, we must first define the right.

Article VIII, N.D. Const., sets forth the state's education system. Article VIII provides, in part:

"*Section 1.* A high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people being necessary in order to insure the continuance of that government and the prosperity and happiness of the people, the legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control. This legislative requirement shall be irrevocable without the consent of the United States and the people of North Dakota.

"*Section 2.* The legislative assembly shall provide for a uniform system of free public schools throughout the state, beginning with the primary and extending through all grades up to and including schools of higher education, except that the legislative assembly may authorize tuition, fees and service charges to assist in the financing of public schools of higher education.

"*Section 3.* In all schools instruction shall be given as far as practicable in those branches of knowledge that tend to impress upon the mind the vital importance of truthfulness, temperance, purity, public spirit, and respect for honest labor of every kind.

"*Section 4.* The legislative assembly shall take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity in course of study, and to promote industrial, scientific, and agricultural improvements."

The district court concluded the uniformity provision in Article VIII, § 2 requires uniformity in "educational opportunity" as measured by per pupil funding. The district court erred in its interpretation of Article VIII. Article VIII, § 2 directs the legislature to create a system of education which is structurally uniform throughout the state. Article VIII, § 2 does not require uniformity in per pupil funding to achieve "equality in opportunity."

In construing constitutional provisions:

"[W]e must undertake to ascribe to the words used that meaning which the people understood them to have when the constitutional provision was adopted. *State ex rel. Sanstead v. Freed,* 251 N.W.2d 898 (N.D.1977). In so doing, it is appropriate to consider contemporaneous and long-standing practical interpretations of the provision by the Legislature where there has been acquiescence by the people in such interpretations."

*Kadrmas v. Dickinson Public Schools,* 402 N.W.2d 897, 899 (N.D.1987).

The record of the North Dakota Constitutional Convention debates reflects the delegates' intent in requiring "a uniform system of free public schools." Article VIII, § 2 was reported out of the committee on education, as follows:

"Sec. 2. The Legislature shall provide at their first session after the adoption of this Constitution for a uniform system of free public schools throughout the State, beginning with the primary and extending through all grades up to and including the normal and collegiate course."

*Official Report of the Proceedings and Debates of the First Constitutional Convention of North Dakota,* p. 152 (1889).

Delegate Patrick McHugh twice attempted to amend section 2 to eliminate the word "uniform." McHugh's first amendment attempted to replace "a uniform" with "an independent district." The amendment was defeated. *Debates of the Convention*, p. 152–53. McHugh's second attempt proposed striking all of section 2 after the word "State" in line three, and inserting:

"And each county of the State shall be divided into a convenient number of independent school districts. But no school district shall be formed containing less than twenty-five inhabitants."

In opposition to the proposed amendment, Delegate William J. Clapp explained:

"This matter of the school district system came before the committee and it was their idea, and the idea of the Convention that while the school district system might be the best, at some other time there might be some better method, and we thought the better plan would be to adopt a uniform system and if so the Legislature will make it uniform. I hope it will stand as it is here."

*Debates of the Convention*, p. 603. The amendment failed.

Clapp's comments clarify the framers' intent. The education committee believed the legislature should create a system of local school districts to provide education for North Dakota's citizens. The committee, however, used the word uniform in section 2 to give the legislature flexibility in determining the best organizational system in the future. The framers did not intend to require the legislature to create an education system with uniform per pupil funding financed by the state.

The early contemporaneous legislative construction of the education provisions also supports the proposition that the state is not required to provide uniformity in per pupil funding. In 1890, the First North Dakota Legislative Assembly enacted chapter 62, entitled: "AN ACT to Provide for a Uniform System of Free Public Schools Throughout the State and to Prescribe Penalties for Violation of the Provisions Thereof." Chapter 62 established school districts and governed the schools in those districts. N.D.Sess.

Laws, ch. 62 (1890); *see also Cardiff v. Bismarck Public School Dist.*, 263 N.W.2d 105, 107–8 (N.D.1978).

Under chapter 62, the state's school system was financed almost exclusively by local taxes. "[T]he First Legislative Assembly did provide for a uniform system of free public schools through a system of school districts, financed by a local ad valorem property tax levy of not exceeding 30 mills. (Sections 101 and 102, Chapter 62, Laws of 1890)." *Dornacker v. Olson*, 248 N.W.2d 844, 848 (N.D. 1976). The first legislature gave local school boards power to levy a property tax of not more than 30 mills in any one year. S.L. 1890, ch. 62, § 101. Chapter 62 also required each county assess a levy of one dollar on each elector in the county and a further tax of two mills for all taxable property in the county for the support of the common schools. S.L. 1890, ch. 62, § 102.

The First Legislative Assembly did not see the funding for North Dakota's schools as the responsibility of the state, but rather as a local function. The only state money for education provided by the first legislature came from fines and penalties for violation of state law, school land leases, and interest and income from the state permanent school trust fund. S.L. 1890, ch. 62, § 90. Use of these funds for education was mandated by Article IX, §§ 153 and 154 of the North Dakota Constitution (1889).

In its original form, prior to its amendment in 1970 and 1982, Article IX, § 153, provided:

"All proceeds of the public lands that have heretofore been, or may hereafter be granted by the United States for the support of the common schools in this state; all such per centum as may be granted by the United States on the sale of public lands; the proceeds of property that shall fall to the state by escheat; the proceeds of all gifts and donations to the state for common schools, or not otherwise appropriated by the terms of the gift, and all other property otherwise acquired for common schools, shall be and remain a perpetual fund for the maintenance of the common schools of the state. It shall be

deemed a trust fund, the principal of which shall forever remain inviolate and may be increased but never diminished. The state shall make good all losses thereof."

Prior to its amendment in 1982, Article IX, § 154, provided:

"The interest and income of this fund together with the net proceeds of all fines for violation of state laws and all other sums which may be added thereto by law, shall be faithfully used and applied each year *for the benefit of the common schools of the state, and shall be for this purpose apportioned among and between all the several common school corporations of the state in proportion to the number of children in each* of school age, as may be fixed by law, and no part of the fund shall ever be diverted, even temporarily, from this purpose or used for any other purpose whatever than the maintenance of common schools for the equal benefit of all the people of the state; provided however, that if any portion of the interest or income aforesaid be not expended during any year, said portion shall be added to and become a part of the school fund." (Emphasis added.)

Although the drafters of North Dakota's Constitution were aware of the divergent value of property throughout the state and, therefore, the differing ability of local communities to raise money for schools, the drafters determined the proceeds from North Dakota's trust fund should be distributed on a per student basis, rather than on an equal educational opportunity basis. *See Debates of the Convention,* pp. 161–63, and 288–89.

Similarly, the early education legislation did not include statewide "equalization" among school districts. As discussed above, the 1890 statutes provided the state's schools would be funded primarily through school district property taxes, county property taxes, and county poll taxes. S.L. 1890, ch. 62, §§ 101 and 102. The school district property taxes were retained within the school district. S.L. 1890, ch. 62, § 101. The county taxes were paid into the state tuition fund. S.L. 1890, ch. 62, § 102. The state tuition fund was apportioned among the counties strictly by the number of school age children residing in each county. S.L. 1890, ch. 62, § 90. Each county then distributed the state tuition fund moneys to school districts on the same basis (the number of school age children in the district). S.L. 1890, ch. 62, § 95. This funding method included no equalization based on the property wealth of a particular school district.

This Court previously has interpreted the education provisions of the Constitution. Those cases concluded the Constitution only requires the legislature to establish a statewide system of schools. Our past opinions make clear the legislature is not required to provide any particular level or type of state funding for education.

In *Todd v. Board of Education,* 54 N.D. 235, 241, 209 N.W. 369, 371 (1926), this Court held Article VIII §§ 1 and 2:

"[R]equires the establishment and maintenance by the state of a uniform system of free public schools, but this requirement is satisfied by provision for the creation of school districts and for a uniform system of schools in those districts."

In *Zenith School District,* 81 N.W.2d at 768, the Court concluded "[s]tate aid to school districts, however, is not reimbursement for or payment for anything. It is a grant in aid and in so far as the local districts are concerned it is in the nature of a gratuity."

In *Dickinson Public School Dist. v. Sanstead,* 425 N.W.2d at 909, the Court explained:

"[T]he Legislature could have required, as it did in the distant past, that all funding for public schools be borne by the local district, inasmuch as the State's constitutional directive to provide a uniform system of public schools is satisfied by provision for the creation of school districts and for a *uniform system of schools in those districts.*"

Other state courts which have interpreted similar constitutional provisions have held "uniform" merely applies to the general system of education, and not to equality in funding. *See Skeen v. State,* 505 N.W.2d 299, 310 (Minn.1993) (constitutional requirement met

so long as all state schools provide "adequate level of basic education"); *Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590, 592 (1973) ("general and uniform" requirement met since Arizona's system assures every child a basic education); *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635, 648 (1975); *Idaho Schools for Equal Educ. v. Evans,* 123 Idaho 573, 850 P.2d 724 (1993) ("[T]he uniformity requirement in the education clause requires only uniformity in curriculum, not uniformity in funding."); *Olsen v. State,* 276 Or. 9, 554 P.2d 139, 148 (1976) (Constitution is "complied with if the state requires and provides for a minimum of educational opportunities in the district and permits the districts to exercise local control over what they desire, and can furnish, over the minimum."); *Coalition for Equit. Sch. Fund. v. State,* 311 Or. 300, 811 P.2d 116 (1991); *Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005, 1018–19 (Colo. 1982), (Colorado General Assembly must provide each school age child the opportunity to receive a free education, and must establish guidelines); *Kukor v. Grover,* 148 Wis.2d 469, 436 N.W.2d 568, 577–78 (1989) ("uniform" requirement refers to such items as minimum teacher certification, minimum number of school days, and standard school curriculum); *Britt v. North Carolina State Bd. of Educ.,* 86 N.C.App. 282, 357 S.E.2d 432, 433–37 (1987); *St. Johns County v. N.E. Fla. Builders,* 583 So.2d 635, 641 (Fla.1991). *But see Seattle Sch. Dist. No. 1 of King Cty. v. State,* 90 Wash.2d 476, 585 P.2d 71 (1978) (school funding system found unconstitutional based on requirement making it the "paramount" duty of the state to make "ample" provision for education); *Washakie Co. Sch. Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.1980) (funding based on county wealth violates equal protection).

Article VIII does not require uniformity in funding to achieve equal educational opportunity. A contrary conclusion disregards the constitutional history of Article VIII, the legislative history of school financing in North Dakota, the prior rulings of this Court, and rulings from states with similar constitutional requirements.

**B**

Although Article VIII does not require uniformity in educational opportunity, it does require the state to create a system of education which ensures basic education. The majority correctly points out a "uniformly inadequate" system would not satisfy the requirements of Article VIII.

Although Article VIII does not set forth a clear mandate that the legislature provide basic education, such a requirement is inherent in Article VIII, §§ 1, 3 and 4. Section 1 provides:

"A high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people being necessary in order to insure the continuance of that government and the prosperity and happiness of the people, the legislative assembly shall ... [establish] ... a system of public schools...."

Section 3 provides:

"In all schools instruction shall be given as far as practicable in those branches of knowledge that tend to impress upon the mind the vital importance of truthfulness, temperance, purity, public spirit, and respect for honest labor of every kind."

Section 4 provides:

"The legislative assembly shall take such other steps as may be necessary to prevent illiteracy, secure a reasonable degree of uniformity in course of study, and to promote industrial, scientific, and agricultural improvements."

The state is meeting its responsibility to provide a basic education. The legislature has created a uniform system to deliver educational services through the use of local school districts supervised by local school boards. N.D.C.C. §§ 15–47–43, 15–29–07, and 15–29–08. Each district must meet a set of statutorily imposed requirements. All public, private, and parochial schools in North Dakota must:

(1) Employ certified teachers (N.D.C.C. ch. 15–36) having at least specific minimum qualifications (N.D.C.C. §§ 15–41–25 and 15–45–02).

(2) Offer courses satisfying at least minimum high school curriculum require-

ments and meet required elementary curriculum requirements (N.D.C.C. §§ 15–38–07, 15–41–24 and 15–45–02).

(3) Teach high school courses for at least a set minimum amount of time for a high school student to receive a unit of credit for the course (N.D.C.C. § 15–41–06).

(4) Hold school for at least a minimum number of days each year (N.D.C.C. §§ 15–47–33 and 15–45–02).

(5) Meet health and safety requirements (N.D.C.C. chs. 15–35 and 18–12; N.D.C.C. § 15–45–02).

The teacher certification and qualifications statutes require all teachers be certified based on standards established by the state superintendent of public instruction. Teachers can teach only in their major or minor field of preparation.

The courses included in the minimum high school curriculum requirements are four units each of English and science, three units each of math and social studies, one unit each of health and physical education, music, and six units of electives from at least two course areas identified in the statute. N.D.C.C. § 15–41–24.

Under the statutory curriculum, students in elementary schools must be taught spelling, reading, writing, arithmetic, language, English grammar, geography, United States history, civil government, nature study, and elements of agriculture. Physiology and hygiene also must be taught. N.D.C.C. § 15–38–07. Other statutes impose additional, very specific curriculum requirements on all schools. See N.D.C.C. §§ 15–38–07 through 15–38–11, 15–47–24, and 15–47–37.

A school's foundation aid payments can be reduced for failure to comply with the curriculum requirements. See N.D.C.C. § 15–40.1–06(2). All public schools in North Dakota, including those in the plaintiff districts, currently meet the statutory curriculum requirements.

Additionally, the legislature has authorized the state superintendent of public instruction to establish standards for accreditation of public and private schools. N.D.C.C. §§ 15–21–04.1 and 15–45–03. Under this statutory authorization, the state superintendent has issued accreditation standards to further ensure educational quality in North Dakota.

The accreditation standards are grouped into eight categories: school improvement, administration, instructional personnel, instructional program, student evaluation, pupil personnel services, library media services, and school policies. Many accreditation standards impose more stringent requirements than are mandated by statute. See *Accreditation Standards, Criteria and Procedures for the classification of Elementary, Middle Level/Junior High, and Secondary Schools,* prepared by the North Dakota Department of Public Instruction, August, 1991.

The content of some accreditation standards differ for different schools based on varying enrollments. The different standards for large and small enrollment schools are based on practical considerations. The size of a district makes a difference in the educational programs the district can offer. Larger schools are expected to meet higher standards in regard to breadth and depth of course offerings. For the most part, the plaintiffs' schools are the larger schools in the state.

Public schools may receive one of four accreditation classifications: (1) accredited with commendation (given to a school that has met the accreditation standards and gone through a school improvement process), (2) accredited (given to a school that has met the accreditation standards but has not gone through a school improvement process), (3) accredited with warning (given to a school that has failed to meet a "required" accreditation standard or a sufficient percentage of the "optional" standards), and (4) not accredited (given to a school that was accredited with warning and failed to correct the problem that caused the warning).

A school accredited with warning suffers no financial penalty during the year it receives the warning, but the school must remove the warning by the next date of accreditation or it will be reclassified as not accredited.

All public secondary schools in North Dakota currently are accredited. All but one of

North Dakota's public elementary schools currently are accredited. All of the plaintiff districts are accredited, some with commendation.

## C

Since the legislature has created a system of education uniform both in organizational structure and in curriculum requirements, the Court's review of Article VIII should be limited to two questions: (1) do the state's curriculum and accreditation requirements ensure a basic level of education so as to produce responsible productive citizens. *See* Art. VIII, § 1, N.D. Const.; *State v. Shaver,* 294 N.W.2d 883, 897 (N.D.1980) ("The State of North Dakota has a recognized and conceded interest in assuring the sufficient education of the children of the residents of the state to enable them to be viable citizens in the community."); and, (2) are the state's minimum requirements being enforced to ensure a basic level of education.

All of the schools in the plaintiff school districts meet the statutory curriculum requirements, and all of the schools are accredited. The plaintiffs do not challenge the adequacy of North Dakota's accreditation system, rather the plaintiffs' action is based on claims of relative harm—harm caused by differences in per pupil funding among districts.

The district judge assumed relative funding differences, and the different choices school districts are forced to make because of funding differences, amounted to a constitutional violation. The district court, however, mistakenly assumed school districts have a right to equal funding. The district court failed to analyze whether the relative differences in funding amounted to denial of some children's right to an education. The district court found inadequacies based on outside reading in newspapers and magazines, and on the defendants anecdotal evidence. The majority makes this same mistake.

Rather than examine all the factors which measure quality in education, the district court focused only on funding. To meet its responsibilities under Article VIII, the state must spend sufficient money to ensure children receive a basic level of education. The

fact some school districts receive more funding per pupil than others, does not necessarily mean the students in the lower funded districts are being denied their constitutional right to an education. Because North Dakota has both small enrollment rural school districts and large enrollment urban school districts, differences in per pupil funding are not surprising. Larger school districts, because of economies of scale, are able to provide services more efficiently than smaller districts. Because there is not a direct correlation between monetary input and education output, comparisons of school districts' per pupil funding are not the measure of whether the state is meeting its constitutional responsibility.

Student output is the appropriate measure of education quality. To assess education quality in the state, the department of public instruction coordinates the administration of the Comprehensive Test of Basic Skills (CTBS), the Test of Cognitive Skills (TCS), and the National Assessment of Educational Progress (NAEP). The CTBS and TCS tests, which are administered and scored together, have been administered in all public schools and almost all private schools in North Dakota in grades 3, 6, 8, and 11 since 1990.

The CTBS test measures achievement in basic skills. The TCS test is a "school ability" test. It does not measure achievement; it measures how well students should be expected to perform in school.

The test results for North Dakota students show students are learning commensurate with their ability. In 1991, North Dakota students on an average scored higher than the national average on all CTBS subtests at all grade levels. North Dakota students also achieved the top scores in the United States on the 1990 NAEP eighth grade mathematics assessment. Contrary to the plaintiffs' anecdotal evidence, differences in district funding do not have an effect on student learning as measured by standardized tests.

Misconstruing the constitutional requirements, the district court fundamentally erred in focusing on the relative funding differences among school districts, and in discount-

ing the state's studies as to education quality as measured by student achievement.

The education clause does not require uniformity in education funding, only that the state ensure a basic level of education. The plaintiffs have not demonstrated the state's system fails to provide a basic education. The requirements of the education clause are being met, and the system is valid under Article VIII.

### III

The majority's equal protection analysis is also faulty. The majority correctly points out that under Article I, §§ 21 and 22, of the North Dakota Constitution, not all legislative classifications are unlawful. We review lawfulness of legislative classifications under three separate standards of review. "The standard used in a particular case depends upon the challenged statutory classification and the right allegedly infringed." *Kadrmas v. Dickinson Public Schools,* 402 N.W.2d at 902. A statute, however, is conclusively presumed to be constitutional unless it is clearly shown the statute violates the state or federal constitutions. *Hall GMC, Inc. v. Crane Carrier Co.,* 332 N.W.2d 54, 61 (N.D.1983).

Equal protection analysis begins with a review of the right allegedly infringed. This case involves three groups of plaintiffs: the nine school districts, taxpayers in each of the nine plaintiff school districts, and parents suing on behalf of their children who are students in the nine plaintiff school districts.

### A

As explained above, the nine plaintiff school districts have no standing to challenge the constitutionality of the state's education funding system.

### B

The taxpayer plaintiffs' argue they are discriminated against under the current funding formula. They claim their equal protection rights are violated because they are paying property taxes higher than taxpayers in other school districts, and their school district should be receiving more money from the state. The district court found:

"Plaintiff taxpayers are denied equal protection in that they must pay proportionately higher taxes on their real estate for the maintenance of education which does not result in equal education opportunity for the students in their districts."

In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, *reh'g denied,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973), the United States Supreme Court reviewed claims Texas' school financing system was unconstitutional. The Court noted wealth discrimination claims in challenges to state public school financing laws are unlike any of the forms of wealth discrimination previously reviewed by the United States Supreme Court:

"Rather than focusing on the unique features of the alleged discrimination, the courts in these cases have virtually assumed their findings of a suspect classification through a simplistic process of analysis: since, under the traditional systems of financing public schools, some poorer people receive less expensive educations than other more affluent people, these systems discriminate on the basis of wealth. This approach largely ignores the hard threshold questions, including whether it makes a difference for purposes of consideration under the Constitution that the class of disadvantaged 'poor' cannot be identified or defined in customary equal protection terms, and whether the relative—rather than absolute—nature of the asserted deprivation is of significant consequence."

*Rodriguez,* 411 U.S. at 19, 93 S.Ct. at 1289, 36 L.Ed.2d at 34. The Court concluded no suspect classification based on wealth was involved:

"However described, it is clear that appellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts. The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disability, or subjected

to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."

*Rodriguez*, 411 U.S. at 28, 93 S.Ct. at 1294, 36 L.Ed.2d at 40 (footnote omitted). *See also Lujan v. Colorado State Bd. of Educ.*, 649 P.2d at 1021; *Skeen*, 505 N.W.2d at 314. The taxpayer plaintiffs are not a suspect class.

The taxpayers in districts with relatively low taxable value per pupil are not, on average, poor. Kathryn L. Strombeck, a research analyst with the Tax Commissioner's Office, compared the average adjusted gross incomes for taxpayers in the plaintiff districts, with statewide average adjusted gross incomes. Strombeck concluded no significant relationship existed between average adjusted gross income and taxable valuation per pupil. School districts with high average adjusted gross incomes do not consistently have high levels of taxable valuation per pupil, nor do they consistently have low levels of taxable valuation per pupil.

The taxpayers in districts with relatively low taxable value per pupil do not necessarily pay higher property taxes than taxpayers in school districts with relatively high taxable value per pupil. The plaintiffs' expert, Dr. John Augenblick, established statistically there is little or no relationship between a districts' property wealth and its mill levy. The taxpayer plaintiffs' only complaint is that because the state has failed to fully equalize its funding to school districts, the school boards in some of the districts, with the consent of the people, have chosen to raise the school districts' mill levy, forcing some of the taxpayer plaintiffs to pay more property taxes than some taxpayers in other districts. This complaint does not state a valid constitutional claim. The equal protection clause does not guarantee taxpayers rates identical to all other taxpayers in the state. *Signal Oil and Gas Company v. Williams County*, 206 N.W.2d 75 (N.D.1973). The legislature has wide discretion to fix the basis of taxation. *Signal Oil and Gas Company* at 82. A tax will be upheld:

"[I]f any state of facts reasonably can be conceived that would sustain it. Furthermore, a court need not know the special reasons, motives, or policies of a State legislature in adopting a particular classification, so long as the policy is one within the power of the legislature to pursue, and so long as the classification bears a reasonable relation to those reasons, motives, or policies."

*Signal Oil and Gas Company* at 83 (citations omitted); *see also Caldis v. Board of Cty. Com'rs, Grand Forks Cty.*, 279 N.W.2d 665, 672 (N.D.1979); *So. Valley Grain Dealers v. Bd. of Cty. Com'rs*, 257 N.W.2d 425, 436 (N.D.1977).

Because the legislature's funding scheme for public education promotes both local control and local involvement, it bears a rational relationship to a legitimate legislative purpose. The district court erred in concluding the taxpayer plaintiffs' constitutional rights are violated by the current public school financing system.

### C

In North Dakota, education is a fundamental right under the North Dakota Constitution. In *In Interest of G.H.*, 218 N.W.2d 441 (N.D.1974), this Court resolved whether G.H., a child with severe physical handicaps, was entitled to have the state pay her tuition at the Crippled Children's School. This Court held:

"We are satisfied that all children in North Dakota have the right, under the State Constitution, to a public school education....

"Handicapped children are certainly entitled to no less than unhandicapped children under the explicit provisions of the Constitution."

*In Interest of G.H.* at 446. After reviewing the United States Supreme Court's *Rodriguez* opinion, this Court concluded, even if education was not a fundamental right under the North Dakota Constitution, G.H. would be entitled to a state funded public education under the equal protection clauses of the United States and North Dakota Constitutions. This Court concluded classifications

based on physical disability are inherently suspect, subject to strict scrutiny:

"When North Dakota undertakes to supply an education to all, and to require all to attend school, that right must be made available to all, including the handicapped, on equal terms."

*In Interest of G.H.* at 447.

In *Lapp v. Reeder Public School Dist. No. 3,* 491 N.W.2d 65 (N.D.1992), this Court reiterated its holding in *In Interest of G.H.,* explaining:

"Under our state constitution, all children in North Dakota have the right to a public school education. N.D. Const. Art. VIII, § 1. Our state constitution also guarantees 'equal educational opportunity' to a handicapped child. *In Interest of G.H.,* 218 N.W.2d 441, 447 (N.D.1974). The school board of a public school has a duty '[t]o establish for all children of legal school age residing within the district, a system of free public schools which shall furnish school privileges equally and equitably.' Section 15–29–08(1), N.D.C.C.; *see also* N.D. Const. Art. VIII, § 2."

*Lapp* at 67 (citations omitted).

*In Interest of G.H.* and *Lapp* are very different from this case. In *In Interest of G.H.,* the issue was which public entity, if any, would be responsible to pay for G.H.'s education. Similarly, in *Lapp,* the issue was the handicapped child's residence so as to determine the financially responsible district. Both *In Interest of G.H.* and *Lapp* involved a total deprivation of the child's right to an education and an inherently suspect classification. This case involves neither a complete denial of education opportunity, or an inherently suspect classification.

A party attacking the constitutionality of a statute must show the statute affects the party's rights in an unconstitutional manner. *Benson v. Schneider,* 68 N.W.2d 665, 670 (N.D.1955). When reviewing challenges to classifications which affect fundamental rights, or important substantive rights, "the challenged law must be shown to 'significantly interfere' with the right ... before a court need apply heightened scrutiny." *Gange v. Clerk of Burleigh Cty. D. Court,* 429 N.W.2d

429, 433 (N.D.1988); *see also Wills v. State,* 821 P.2d 866 (Colo.App.1991) (When a statutory classification significantly interferes with the exercise of a fundamental right, the strict scrutiny test is used to evaluate its constitutionality.); *Walters v. Edwards,* 396 F.Supp. 808 (E.D.La.1975) (If classification of voters into two groups significantly interferes with fundamental right, such classification must meet compelling state interest test to pass equal protection scrutiny.).

The plaintiffs have not proven a "significant interference" with their fundamental right to an education. The scope of the plaintiffs' fundamental right to an education is defined by Article VIII. Article VIII requires the state to provide a basic level of educational opportunity. The state has met its responsibility under Article VIII through the establishment of a uniform system of schools with curriculum and accreditation standards. Since Article VIII is satisfied under the current system, the plaintiffs' fundamental right to an education is not infringed. The appropriate standard of review, therefore, is the rational basis test, which is "the traditional standard for scrutinizing legislation facing equal protection attack and is most often utilized in cases involving economic and social welfare legislation." *Kadrmas,* 402 N.W.2d at 902.

In *Kadrmas,* several parents brought an action to enjoin the collection by a school district of a fee for school bus transportation. The parents asserted under Article VIII, § 2, the state was required to provide free school bus transportation because it is an essential element of the education process. This Court rejected the parents' claim, holding:

"In our view transportation is not a necessary element of the educational process, and it is not an integral part of the educational system to which the constitution refers in requiring the Legislature to provide 'a uniform system of free public schools.' Although transportation may be an important prerequisite to accepting the educational opportunities offered in the public school system it is not part of the system."

*Kadrmas* at 901. In *Kadrmas,* the parents also challenged the statute authorizing school bus charges as violating their rights to equal protection. The parties based their equal protection challenge on two classifications. First, they asserted the transportation charges created a wealth classification which discriminated against poor persons. Second, they asserted the statute, by authorizing only school districts which had not been reorganized to charge a school bus service fee, created a classification between reorganized and nonreorganized districts, which discriminated against persons residing in nonreorganized districts.

This Court applied the rational basis test and upheld the statute:

"In our view the challenged statute in this case is purely economic legislation which neither involves a suspect classification nor a fundamental or important substantive right which would require the strict scrutiny or intermediate standard of review. . . . We conclude that the rational basis test is the appropriate standard of review for the plaintiffs' equal protection claims in this case. Accordingly, Section 15-34.2-06.1, N.D.C.C., must be upheld unless it is patently arbitrary and fails to bear a rational relationship to any legitimate government purpose."

*Kadrmas* at 902. This Court concluded the statute was rationally related to the legitimate governmental objective of allocating limited resources, and the statute did not discriminate on the basis of wealth so as to violate federal or state equal protection rights. *Kadrmas* at 903.

The current financing system satisfies the rational basis test. The system provides a basic education to all of the plaintiffs. The system also fosters local control and involvement in education, a legitimate legislative goal.

#### D

The plaintiffs make a valid public policy argument when criticizing the shortcomings of the 22 mill deduct[1] in the state's founda-

tion aid program. The deduct is not working as it did originally, and it is unfortunate the legislature has not done more to correct the problem. The job, however, is the legislature's. Issues of funding necessarily involve the balancing of an infinite number of variables, and involve making value judgments as to which variables deserve more attention. Value judgments associated with allocating scarce resources, in most situations, are properly made by the legislature, with the consent of the people. The judiciary's role is limited. The judiciary should not "constitutionalize" complex public policy issues unless fundamental or substantive rights are being abridged.

More involved than the truncated version stated by the majority, the stated intent of N.D.C.C. § 15-40.1-06 is to support elementary and secondary education based on educational cost per student (with various exclusions). It does not state the goal is to "equalize" or "achieve equality" in per pupil spending. The majority claims the legislature has not sufficiently achieved the funding goal the majority says the legislature has established, and therefore, the funding system is unconstitutional. Even if the section represented a legislative goal to equalize funding for schools in the state, equalization is not a constitutional requirement. The legislature can create and eliminate funding goals at will as long as it ensures basic educational opportunity to all North Dakotans. The legislature's failure to meet a goal of equalized funding would not render the entire education funding system unconstitutional.

The majority, citing to no specific legal principle, creates a new substantive right under the North Dakota Constitution: The right of school districts to receive less disparate per pupil funding than they are currently receiving. The majority concludes strict scrutiny does not apply because "legislative determinations about the financing mix for education involve difficult questions of local and statewide taxation, fiscal planning, and

---

1. *See* N.D.C.C. § 15-40.1-06(3)(a). The deduct has been increased by the legislature to 23 mills for the 1993-4 school year, and to 24 mills for each year thereafter. N.D.Sess.Laws 1993, ch. 3, § 19.

education policy, which are ill-suited for strict scrutiny analysis."

The majority, however, later concludes such determinations are suited for intermediate substantive right scrutiny:

"Although the statutory method for distributing funding for education may not totally deprive any student of access to the fundamental right to education, we believe the method of distributing funding for that fundamental right involves important substantive matters similar to those rights involved in cases in which we have applied the intermediate level of scrutiny."

The majority does not explain the legal source of the substantive right, or define what level of funding equality is mandated under its requirements. The majority's "we know it when we see it" approach tells the legislature to "try again," without providing the legislature with a blueprint for constructing a new system.

Under the majority's holding, the legislature could meet its constitutional obligation of providing "equal educational opportunity" by decreasing the amount of funding given to "property rich" school districts, without increasing the funding to the "property poor" school districts. The majority's opinion leads to this absurd result because of the majority's failure to clearly define a child's fundamental right to an education.

The majority's opinion is an example of why issues of funding are best left to the discretion of the legislature. Unless the legislature is denying a child his or her constitutional right to an education or acting in an arbitrary fashion, this Court has no business telling the legislature how to finance education. The majority's holding is not an appropriate exercise of judicial power, and is not a proper interpretation of the North Dakota Constitution.

I would uphold the constitutionality of North Dakota's school financing system.

VANDE WALLE, Chief Justice, dissenting in part.

I agree in part with Justice Sandstrom's analysis of the issues and application of the law. Although both the trial court's opinion and the majority opinion conclude that a per-pupil-payment equality is not necessary in order that the statutory scheme pass constitutional muster, the evidence upon which they rely and their analysis of why the present scheme is unconstitutional discuss the issues on essentially a per pupil basis. In the same manner, the trial court and the majority opinion acknowledge the legitimacy of the factor of economy of scale, i.e., that the costs for educating students do not rise proportionally to the increase in the number of students, but do not apply that factor to the comparison of "rich" and "poor" districts and give no more than lip service to the factor in their reliance on per pupil comparison and per pupil analysis to reach their result. Without more, I cannot conclude that the evidence supports more than a finding of inequity—an inequity which has not yet reached constitutional proportions. A comparison of the very worst with the very best of 269 school districts cannot be the basis for finding unconstitutional disparity among all districts.

The challenge in this case closely resembles the challenge in *Skeen v. State*, 505 N.W.2d 299 (Minn.1993), where a majority of the Minnesota Supreme Court concluded the Minnesota scheme for funding education complied with the requirement that the legislature establish a general and uniform system of public schools.[1] There are, however, two dramatic factual differences between this case and *Skeen.* In *Skeen,* the per-pupil-payment from the State was $2,953 (increased to $3,050 for 1992 and subsequent

---

1. The Minnesota Constitution may appear even more specific in that it requires the Legislature to provide sufficient financing to secure a thorough and efficient system of public schools throughout the State. *See Skeen v. State,* 505 N.W.2d 299 at 301 (Minn.1993). The North Dakota Constitution, Article VIII, §§ 1, 2, 3, and 4, contains no such specific requirement as to fi-

nancing. However, it is obvious that the Legislature must provide for the funding of education. *See State ex rel. Walker v. Link,* 232 N.W.2d 823, 826 (N.D.1975) ["Neither the Legislature nor the people can, without a constitutional amendment, refuse to fund a constitutionally mandated function."]

years). Here, as the majority notes, the State payment was $1,608 for the second year of the 1991–1993 biennium. However, the parties tell us, this case is not about the amount of money allocated for schools, but rather how the money is distributed.

The second difference and, if the plaintiffs' argument is not that the Legislature has failed to fund the schools, the more significant difference, is that in Minnesota the fully equalized State funding rate was near 93% while North Dakota was at 52.8%. Although it is tempting to use this disparity as a reason for rejecting the Minnesota analysis, I agree with Justice Sandstrom that the evidence does not indicate a present inability on the part of the plaintiffs to provide an adequate education.

Despite my agreement in part with Justice Sandstrom's opinion, I write separately to emphasize the most obvious teaching of Justice Neumann's opinion, and that of the trial court, i.e., that the present system is fraught with funding inequities which I believe have not yet transgressed the rational-basis standard of review but which appear to me to be on a collision course with even that deferential standard.

As the opinion of Justice Sandstrom concludes, the education clause of our Constitution "does not require uniformity in education funding, only that the state ensure a basic level of education" and, according to *Todd v. Board of Education,* 54 N.D. 235, 241, 209 N.W. 369, 371 (1926), "this requirement is satisfied by provision for the creation of school districts and for a uniform system of schools in those districts." Nevertheless, when the State requires a minimum curriculum as it seemingly must to achieve minimal "uniformity," while at the same time it imposes a maximum mill levy, [*see* NDCC § 57–15–14]; regulates the assessment of taxable property [Article X, § 4, N.D. Constitution, Chapter 57–02, NDCC]; provides for assessment at the State level of certain property [Article X, § 4, N.D. Constitution]; exempts certain property from taxation [Article X, § 5, N.D. Constitution, *see, e.g.,* NDCC § 57–02–08]; and exempts property from local taxation by means of "in lieu" taxes paid to the State [*e.g.,* Chapter 57–51, NDCC (oil and gas gross production tax) and Chapter 57–51.1, NDCC (oil extraction tax) ], it is apparent that the school districts established to meet the requirement of Article VIII, N.D. Constitution, are far from unfettered in their ability to raise the necessary funds to implement the required minimum curriculum which is said to satisfy the "uniformity" requirement.

Regardless of the precise words used by the Legislature, the enactment of the State School Aid, "foundation program," is a recognition that school districts are, under existing statutes, unable to raise the funds locally to provide an adequate education for the students in those districts. The "deduct" specified by section 15–40.1–06, NDCC, is recognition that the inability to locally raise necessary funds to educate students is not uniform, that the inability is greater in some districts than others, due, perhaps in part or even in total, to the previously described constitutional and legislative restrictions imposed on school districts. Because the "deduct" does not approach a pragmatic "school district equalization factor" as the title of section 15–40.1–06, NDCC suggests, it seems inevitable that the restrictions on the ability of school districts to locally raise necessary funds for education (read for minimum curriculum), when coupled with the failure of the "deduct" to "equalize" that inability through greater State revenue for those districts having insufficient local tax resources, will eventually require a conclusion that the scheme is unconstitutional at least as applied to the students in those districts. Although Justice Sandstrom concludes in his opinion that the parents and students have not, in this case, proven they have been denied a minimum curriculum taught by qualified teachers or that, by objective testing they have been denied a minimum uniform education, that proof may well be evident in the future under the present scheme.